Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 0:25-cv-61608-MD

LYONS WEALTH MANAGEMENT, LLC,

     Plaintiff,

vs.

WOLPER LAW FIRM, P.A., and
MATTHEW E. WOLPER,
     Defendants.
_____/

REMOTE VIDEOCONFERENCE DEPOSITION OF SANDER READ
(as Corporate Representative Designated by Plaintiff,
Lyons Wealth Management, LLC)
TAKEN ON BEHALF OF THE DEFENDANTS

DATE:          FRIDAY, MAY 1st, 2026
TIME:          10:10 a.m. - 1:46 p.m.
PLACE:         By Videoconference

Reported By:
Dave Shallbetter, Court Reporter
Magna Legal Services
866-624-6221
www.MagnaLS.com



APPEARANCES VIA VIDEOCONFERENCE:

SHRUTI KADAM, ESQUIRE
WAUGH PLLC
201 East Pine Street, Suite 315
Orlando, Florida 32801
skadam@waugh.legal
Counsel for Plaintiff


ALEX ERSHOCK, ESQUIRE
JENNIFER LETO, ESQUIRE
LEWIS BRISBOIS BISGAARD & SMITH LLP
110 Southeast 6th Street, Suite 2600
Fort Lauderdale, Florida 33301
Alex.Ershock@lewisbrisbois.com
Jennifer.Leto@lewisbrisbois.com
Counsel for Defendants


ALSO PRESENT VIA VIDEOCONFERENCE:
MATTHEW E. WOLPER, DEFENDANT
JOE CALVARESE, VIDEOGRAPHER



I N D E X

                                                            PAGE

TESTIMONY OF SANDER READ

      CERTIFICATE OF OATH                                     93

      CERTIFICATE OF REPORTER                                 94

      ERRATA SHEET                                            95

      READ & SIGN LETTER                                      96

                  DEFENDANTS' EXHIBITS

No.          Description                                    Page

1            Article                                          39

2            State Court Complaint                            39

3            Settlement Agreement                             40

4            Document- Lyons Enhanced Yield Program           68

             Understanding Your Statements and Cash

             Flow

                  S T I P U L A T I O N S

      It is hereby stipulated and agreed, by and between counsel present for the respective parties and the deponent, that the reading and signing of the deposition are hereby RESERVED.



Page 4

THE VIDEOGRAPHER:  We are now on the record. This begins Videotape No. 1 in the deposition of Sander Read in the matter of Lyons Wealth Management, LLC, v Wolper Law Firm, P.A. and Matthew E. Wolper.  Today is May 1st, 2026, and the time is 10:10 a.m., Eastern.  This deposition is being taken virtually at the request of Lewis Brisbois Bisgaard & Smith, LLP.  The videographer is Joseph Calvarese of Magna Legal Services.  The court reporter is Dave Shallbetter of Magna Legal Services.  Will counsel and all parties present state their appearances and whom they represent.

MS. KADAM:  Shruti Kadam from Waugh PLLC for plaintiff, Lyons Wealth Management, LLC.

MR. ERSHOCK:  Good morning.  Alex Ershock of Lewis Brisbois Bisgaard & Smith for both defendants with me, but not participating in the deposition is my client, Matthew Wolper, and my associate, Jennifer Leto.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness?

THE COURT REPORTER:  Mr. Read, please raise your right hand.  Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?



Page 5

THE WITNESS:  Yes.

THE COURT REPORTER:  Thank you.  Counsel, you may begin.

THEREUPON,

SANDER READ,

being by me first duly sworn to tell the whole truth, as hereinafter certified, testified as follows:

BY MR. ERSHOCK:

Q.  Good morning, Mr. Read.  Could you please state and spell your name for the record?

A.  Yeah, it's actually Alexander Read.  Sander's a nickname.  So it's A-L-E-X-A- -- (Zoom distortion) R-E-A-D.

Q.  All right.  And just -- just so we're clear, you're -- you cut out in the middle of your spelling there.

A.  A-L-E-X-A-N-D-E-R R-E-A-D.

Q.  Okay.  And Mr. Read, for whom are you employed?

A.  Lyons Wealth.

Q.  That's the plaintiff in this case?

Is that the plaintiff in this case?

A.  Yes.

Q.  Okay.  Mr. Read, have you ever had your deposition taken before?



MAGNA
LEGAL SERVICES

Page 6

A. Yeah, I think, a long time ago, yep.

Q. And when -- when would you estimate that your last deposition was taken?

A. Hello?

Q. Mr. Read, do you need me to repeat the question?

A. Yeah, I took a deposition, like, ten years ago. I'd have to get you the date. Yeah.

Q. Okay.

A. I've done a deposition. Yeah. Okay.

Q. And was that in your personal capacity or capacity representing a -- a corporation?

A. It was representing a corporation.

Q. Was it --

A. Actually it was more like 15 years. Yeah. It's like 2008. So 18 years ago, yep.

Q. Okay. And was the -- was the corporation you were representing the same one you're employed by now?

A. Yes -- actually, no, it was Alexander Reed Investment Management.

THE VIDEOGRAPHER: Sorry to interrupt. Mr. Read's video is off.

THE WITNESS: Do I have to keep the video on?

BY MR. ERSHOCK:

Q. You -- you do because I -- I can -- I can see,



Page 7

and I have seen prior to this that you're not with anybody else right now, but --

A.    Okay.  I see.

Q.    And in addition, you know, I sort of, need to -- if we were doing this the old way, I'd be, you know, we'd be across the -- the room, across the table from each other and I'd be able to see your -- your mannerisms, your responses, things like that.

A.    Okay.

Q.    It shouldn't be any different because we're doing this virtually.

A.    Fair enough.  There you go.

Q.    Thank you.  All right.

Other than this corporate representative deposition about -- over 15 years ago, have you ever -- have you had your deposition taken since then?

A.    I mean, I've -- I have a -- you know, I got a divorce.  I'm just trying to think if it was -- I suppose, so I've done depos, but I haven't been deposed. I guess that -- that I can recall this minute.  I -- I know the rules, though -- whatever -- you know, speak clearly, answer clearly, blah, blah, blah...  I got it.

Q.    All right.  Well, I just -- just to make sure that I state, then, another rule is that if you don't understand the question I'm asking you, please ask me to



Page 8

repeat it.  Because if you do answer, I'm going to

assume you understood what I'm asking you.

A.    Sure.

Q.    Okay.  I -- I understand that you are

currently in transit, as we speak, during this

deposition?

A.    Right.

Q.    Any particular reason for that?

A.    Yeah.  First of all, I assumed that this

wasn't going to happen today.  That we were asking for a

some sort of extension and, you know, at the last minute

it's like, No, it's actually happening.  And I have

meetings down in Vero this afternoon, so I have to get

down there.  But I'm here with you right now.

Q.    For what reason did you assume this wasn't

going to happen today?

A.    Because I made it really clear that I wasn't

ready for this.  And, you know, a lot of the dates and

things that -- that I -- that are -- I think you guys

are going to ask about, I have to -- I have to confirm

the dates.  I hadn't had a chance to do it.  We had a

very busy quarter because of the -- the war and the

market volatility.  So this -- this, kind of, creeped up

on -- on me pretty quickly.

Q.    Do you recall when you were asked about



Page 9

availability for deposition dates?

A.   I do, I recall -- and I -- and I said May 1st, but then based on the, you know, requests that I got and some of the questions, I'm like, Wait a second.  We -- we need more time to prepare.  And evidently the judge isn't available or something, so...

Q.   Okay.  Do you know what efforts, if any, were made to secure a -- an extension of time on your behalf?

A.   I believe Christian and, you know, his firm requested it.

MS. KADAM:  I'm going to object to form to these questions to the extent that it deals with attorney-client privilege.  Sorry, I was muted.

BY MR. ERSHOCK:

Q.   I'm not asking you to tell me any content of any conversations that you have had with your attorney.  I'm simply asking whether you are aware of any -- any particular efforts.  You don't have to tell me anything that you were told by your attorney.  In fact, I don't want to know that, but I just -- I'm trying to get to the bottom of why you believe this wasn't going to happen today, even though this has been noticed for over a month?

A.   Because, you know, we -- I have to deal with -- as a businessman, like, one thing at a time.



Page 10

And as this was approaching, I pulled up all the things we needed to do to get -- get ready for this.  And it's -- it's a large volume of -- of requests and questions.  So I said, You know, we probably need more time to prepare, because I'm running a company while this is happening.  And so that's -- that's it.  Like, I -- I want to answer all your questions.  I want to give you times and dates and -- and everything that you ask.  Like, this came up fast.  You know, point of view.

Q.   Your answer cut out in the middle of that with some static.  Can you -- can you repeat, like, maybe the last couple sentences that you were saying?

A.   Yeah -- yeah.  Basically -- so I run a company; right?  And I knew this was coming up.  So, you know, I have to categorize and -- and -- you know, I take -- take one subject at a time.  And when this came up, I realized there's -- there's a large volume of questions.  There's, kind of, a onerous discovery request, which I don't think is that pertinent to -- to the situation.  So -- so I told my -- I mean, I was like, Hey, listen, I'm going to need more time to prepare for this.  Also, one of my colleagues that was part of, you know, the -- the discovery of the second article and all the other issues that -- that cropped up after that.  He was hard to get a hold of.  I finally



Page 11

got ahold of him yesterday.  So, a lot of, you know, your questions, I -- I've been trying to address the last week or so to get prepared for this.  But like I said, it's -- it's -- it's a surprisingly large amount of questions and dates.  And -- and so, I'm as prepared as I can possibly be, but I -- I thought maybe we'd be able to postpone this.

Q.   Okay.

A.   But I'll -- I'll answer my best ability.

Q.   Okay.  Do you understand, Mr. Read, that the testimony you're giving today is that of a corporate representative?

A.   Yeah.

Q.   And that you may be asked questions that you don't personally know?

A.   Yes.

Q.   Okay.  And you're prepared to talk about, to the largest extent possible, the topics of inquiry attached to the Notice of Taking Deposition in this matter?

A.   Yes.

Q.   Mr. Read, what is -- what is Lyons Wealth Management?

A.   It's an SEC registered investment advisor and an LLC.



Page 12

Q.   And how long has Lyons Wealth Management, this -- that particular entity, been a SEC registered investment advisor?

A.   Since 2009.

Q.   How many people would you say are employed with Lyons Wealth Management, including yourself?

A.   Five.

Q.   And what are the names of the other employees who are employed by Lyons Wealth Management?

A.   Dawn Rutton, Austin Jack, Michelle Browman and affiliates, basically, Mark Zavanelli and Allen DeGargelisa, who's down in Palm beach.

Q.   Can you spell the -- the last person's name?

A.   I'm sorry.   That's a -- D-E- -- I'll have to look it up.   It's did D-E-D- -- D- -- D-E-L-A-G-E-Z- -- I'll have to get it to you.   Yeah.

Q.   Okay.

A.   There, it's on the website.   You can look.

Q.   All right.   So these five individuals, Dawn, Austin, Michelle, Mark, and I believe his name was Allen, those are the five people who are employed by Lyons Wealth Management?

A.   Yep.

Q.   Six would be including yourself?

A.   Yes, that's right.


MAGNA
LEGAL SERVICES

Page 13

Q. Okay. Are you familiar with an individual by the name of Corey Roun?

A. Yes. He -- he left the firm, I think, in November.

Q. Do you have any understanding as to why?

A. He wanted to basically do what's called box trades. It's, like, a whole different sort of -- realm of investment management. And as a firm, I didn't want to really go down that road. So that was -- that was primarily the reason.

Q. So he had different career goals than, perhaps, you were able to offer?

A. Yeah.

Q. Okay. What -- what did you do to prepare for this deposition today?

A. I reviewed, you know, our files. I clicked through all the -- sort of the first breach, the second breach that you are -- some of the dialogue between -- between us about, you know, the situation. I basically went through the files of this case.

Q. Okay. Did you speak to anybody today to prepare for your deposition?

A. I spoke with Christian last night, but no, not today, no.

Q. Understanding that I don't want to know the



Page 14

content of anything you talk about.  Did you speak to any other attorneys at Christian's firm to prepare for this deposition today?

A.   Yeah, she's on here with me.  She's -- it's tough to pronounce, Shruti.

Q.   Okay.  So you spoke with the -- the counsel who's currently present about the deposition?

A.   Yes.

Q.   Okay.  What about anybody else outside of Christian's firm?  Did you speak with anybody else to prepare for the deposition today?

A.   Not really, no.  Oh, well, I spoke with Corey.  Yeah.

Q.   You spoke with Corey.  Okay.

A.   So -- well, we -- we did.  You know, we discussed some of these accept or deny -- admit or deny questions.  And, you know, some -- some of the -- some of the content of your request basically.  So, like I said, it's -- I should have done this a couple weeks ago, but -- but we -- we went over a few things yesterday.

Q.   Yesterday you said?

A.   Yeah.

Q.   How long did you speak with Mr. Brown -- or -- Roun?



MAGNA
LEGAL SERVICES

Page 15

A.   It was -- it was basically text, for probably an hour on and off.

Q.   Any other times you spoke with Mr. Roun about preparing for this deposition?

A.   No, I have not.

Q.   Between the time Mr. Roun left the firm and November 2025 and, let's say, yesterday, have you spoken with him about the case in general?

A.   No.

Q.   Except for yesterday, when you were talking to him about some of the things relating to this deposition?

A.   Yes.

Q.   Understood.  Okay.  Anybody else that you might have spoken to that is not Mr. Rutten, or anybody from Christian's firm about this deposition?

A.   No.

Q.   Okay.  What kind of investment services does Lyons Wealth Management offer?

A.   Wealth planning and asset management.

Q.   Does Lyons Wealth offer different strategies --

A.   We do.

Q.   -- for investing money?

A.   We have roughly six or seven other strategies



Page 16

that we offer, yes.

Q.   Okay.  And is one of those strategies called the enhanced yield program?

A.   It is.

Q.   Okay.  And what is the -- what -- how would you generally describe what the enhanced yield program is?

A.   Well, it's a leveraged -- leveraged program to either take advantage of interest rate differences between high-yielding stocks and the borrowing rate, or relatively complex option trades to generate income on long positions or overlays on single-stock positions.

Q.   Okay.  You said something called options trades.  What -- what does that mean?

A.   Sorry, ask that again.

Q.   You said the enhanced yield program uses relatively complex options trades.  So I just wanted to understand what an option trade means.

A.   Well, do you know what options are?  I mean, options are basically instruments that trade in line with stock direction or each [Zoom distortion] directions.  And I say complex, it's not complex to us, but to the -- to the layman investor, it's relatively complex trading strategies.  For instance, we do butterfly trades on top of positions.  And that would be


MAGNA
LEGAL SERVICES

Page 17

a sold position at the -- at the -- at the money strike and two out of the money positions bought.  Covered calls, put spreads, calendar spreads.  So that gets overlaid on top of, let's say, a large stock position like Microsoft or it's traded on cash.  And yeah, so that's -- that's a strategy.

Q.  I would say that my understanding of what options trades are basically limited to what calls and puts are.  What is -- what is a butterfly trade?

A.  I just described it.  It's -- it's either a long or a short and it's bought -- two bought inside or two sold inside and then two sold outside, away, but not out of the money.  You can Google it, but basically those are trades we do inside the yield program.  The idea is to generate alpha on top of underlying positions or on cash.  And in some cases we trade long positions of stock with high yielding dividends and -- versus a less expensive borrowing rate.

Q.  When you say generate alpha, what is alpha mean?

A.  Alpha -- so let's say that your portfolio, if it's in cash, generates 4 percent and we make 3 percent in addition to the 4 by trading, that 3 percent's alpha.

Q.  So, I guess, the understanding of what alpha is, just based on what you said, is, like, the



Page 18

additional return that can be generated rather than just having nothing happen.

A.   Exactly, exactly.  And that's the goal of the program.

Q.   Okay.  And you mentioned the term overlay before, and I just want to make sure that I understand what that term means.  What -- what does it mean when you said you take overlays?

A.   Well, it's basically -- let's say you have $1 million in an account, whether it's cash or stock position.  And -- and we're going to use margin to overlay the positions on top of that underlying position.  So let's say you own $1 million worth of Microsoft and you don't want to sell it.  We can't -- we're not going to sell the stock.  So we're going to use margin to overlay on top of that position.  So that's what I call it.  And that's what Wall Street calls it.

Q.   Okay.  So I guess my understanding of what you mean by overlay based on what you just described, is that you've got some kind of security as the quote, Underlying position.  And then on top of that, you are using margin, which is, I guess, what I understand to be borrowing money against the value of the underlying position in order to --



MAGNA
LEGAL SERVICES

Page 19

A.    That's correct.

Q.    -- let me finish my understanding first.  To create the potential for additional gains on top of whatever is created by the underlying position; is that right?

A.    That's right.

Q.    Okay.  And margin, as I understand it, is essentially increased liquidity?

A.    You know, the analogy I use is like equity from your house, let's say you have a $1 million house.  And it's paid for.  You can borrow 80 percent of the equity.  That's what margin is on stock.  So if you have $1 million worth of stock, you can borrow 80 percent against it.  And that's called margin.

Q.    And do you have to pay any interest on this amount that you borrow?

A.    You do.  You pay interest to the broker dealer.

Q.    And you would have to, eventually, pay back that interest, just as you would using your example if you took, like, a home equity loan --

A.    You could or you could continue to borrow money.  It depends on the situation.  It's -- there's no end date to the margin.  It's -- it's as long as the security has value.



MAGNA

LEGAL SERVICES

Page 20

Q.   But you -- but is there ever a -- is there ever a situation where you borrow money on margin and you don't have to pay any interest on a periodic basis?

A.   Not -- not really.  No, that doesn't exist. It's like you can't borrow money from your house for free.  I mean, there's no 0 percent margin.

Q.   Okay.  So the -- the main difference then between your -- your analogy, the equity from the house and the actual conditions of margin is that margin can extend indefinitely, so long as there's underlying value on the security.

THE COURT REPORTER:  Excuse me, this is the court reporter.  Am I the only one seeing the witness frozen?

MR. ERSHOCK:  I believe he is frozen.

THE WITNESS:  I can hear you guys.

BY MR. ERSHOCK:

Q.   Do you need me to repeat back the question?

A.   There you go.  Yeah, I'm -- no, I -- I heard it, yeah, margin goes on forever.  As long as it's -- there's security underneath.

Q.   Okay.  And you would -- and when would the -- when do interest payments on -- on the margin start?  Do they start at sometime down the road?  Do they start, like, immediately?  When does that happen?



Page 21

A.   Immediately.  Yeah, they start immediately. Most broker dealers accrue daily.  It's just -- again, it's just like a house.  Like, if it's -- if you borrow money for a month, you've got to pay interest for the month.  If you borrow it for five days, you got to pay interest for five days.

Q.   Okay.  So -- so what it sounds like is when you take margin, it sounds like you can, potentially, increase the amount of appreciation of value that you can make; is that right?

A.   It's -- it's a double-edged sword.  You can make money and you can lose money; right?  Sure.  Either way.

Q.   How -- how would one lose money on a -- on a margin trade, I guess?

A.   Well, same way -- let's say you have $1 million of stock and it goes down 10 percent.  You lost 100,000; right?  So -- or you have $1 million worth of stock and it goes up 10 percent, you make 100,000.  If you borrow a million, now you have 2 million and it goes down 10 percent, you lost 200,000.  Or you borrow a million, you -- and you make 10 percent, you're up to 200,000.  So it exacerbates --

Q.   I think the -- the witness's cameras dropped out again.



MAGNA
LEGAL SERVICES

Page 22

A.   I'm with you.  I'm -- you froze for a second.

Q.   Okay.

A.   Sorry.  Can you hear me now?

Q.   Yes.  Are you perhaps running the Zoom on -- on a phone right now?

A.   Yeah.  I mean, I'm on the -- the Beeline.  So it's -- this is where coverage is shitty, but I -- I mean, so yeah, I mean, it would be better without the [Zoom distortion] the video.  So I mean, we just have to get through this patch here.

Q.   Are you connected to something like Android Auto or CarPlay?

A.   I am -- I am and it's [Zoom distortion] I'm driving [Zoom distortion] that we even have [Zoom distortion] I'm connected to my car.  Yeah, but I put my headset in for better [Zoom distortion]...

Q.   Okay.  I wonder -- I wonder if that's also interfering with the -- the video feed because you are -- as you mentioned earlier, you are in transit as we -- as we speak.  Okay.

A.   Yeah.

Q.   So we were talking about margin and how it -- how it affects the -- the returns.  That it can be amplified in a positive or negative direction.  Is there any, kind of, descriptor for -- for how many -- how



Page 23

many -- I'm struggling to describe this -- how many times over you are borrowing against your value of your underlying security?

A.   Every client is different and you can borrow -- so we have what's called portfolio margin, which allows 6.71 leverage.  It can be even more than that if you hedge the positions underneath, but you'll have one client that's two to one and another client that's four to one.  So every client is different.  It's not run as a fund.  It's -- every single client has different leverage and different returns.

Q.   Okay.  That's sort of -- that, sort of, brushed out what I was trying to ask.  So you said that portfolio margin can be 6.5 to 7 times, just as an example, I'm not going to hold you to that, obviously, but it can be that much in addition to the value of the underlying security.  So in your example, before, if you have $1 million, if you were ma- -- if your margin was at 6.5, you would have $650,000 in marg- -- or, excuse me, 6.5 million in margin versus the 1 million in the value of the underlying asset; is that right?

A.   You could borrow even more, like 20 -- 20 times if you're hedged.  And so yeah, but the baseline for portfolio margin, which is not what we offer, it's what the broker dealer offers.  We utilize that



Page 24

portfolio.  So the baseline for portfolio margin, the Wall Street terminology is 6.71.  So you could have $1 million of stock and borrow $6.7 million on top.  That's correct.

Q.   Okay.  And I'm guessing here, but it seems to make sense that the amount of money that you borrow will ultimately affect whatever the -- the interest payment is; correct?

A.   I mean, there's breakpoints, but Interactive Brokers is the broker/dealer we primarily use.  And they have -- they have, sort of, breakpoints, but it's a very low rate in general to borrow.  It's less -- like, right now it's 4.49 percent, which is less than mortgages, but that would be on $1 million or more.

Q.   Well, the point being is that if you were borrowing, let's say, five times the amount of your underlying security, let's just continue to use your example of $1 million.  You're borrowing $5 million on margin.  Your interest payment would be based on the $5 million and not the --

A.   That's right.

Q.   Okay.

A.   Right.  Yeah, yeah.  Cash -- cash earns interest and margin costs interest.  That's -- that's fair.



Page 25

Q.   Okay.  Understood.  So in order for a trade or a security to be profitable or -- strike that.

In order for an investment to be profitable when using margin, your return is going to have to exceed, not only the value of the underlying investment, but it's also going to have to exceed any margin interest that you ultimately end up paying; correct?

A.   Yes.

Q.   Okay.  Would you, in general, say that the enhanced yield program is a program for someone who wants to be a conservative investor?

A.   No.

Q.   Would you say that the enhanced yield program is for someone who wants to be a moderately risky investor?

A.   It depends on the client.  Like I said, we can -- we can increase or decrease the leverage depending on the client risk tolerance.  So you could, hypothetically, have a moderate investor in the program.

Q.   Okay.  Let me dive in a little bit to the -- the facts of this case.  It's my understanding that, at least in part, you are suing for -- for -- for defamation -- my clients for defamation; is that correct?

A.   Yes.



Page 26

Q.   And when I say you, you understand that Lyons Wealth Management is suing.  Not you pers- --

A.   Correct.

Q.   -- okay.

A.   Right.

Q.   And tell me about -- well, this would normally be the case where I want to show you a document.

A.   You can show it to me, I'll look.

Q.   Okay.  Please make sure you're pulled over while I pull this up, or you're in a safe place.  All right...

A.   I mean, the problem is -- is, it's the size. I don't know how big it's going to look, but go ahead.

Q.   I'm showing you a -- on your screen, kind of, a copy of the -- the article in question.  It was attached to your complaint.  I tried to clear it up as much as I could so that we could move some of the -- the banners and the images out of the way so we could get as much of the text as possible.

A.   Okay.

Q.   But I'll represent to you that this is based on your Exhibit A to the complaint.

A.   Okay.

Q.   And this is -- this is the article that you were contending is defamatory in nature?



Page 27

A.    Right.

Q.    Okay.  Is there anything else other than this particular article that Lyons Wealth is claiming is defamatory -- a defamatory statement that is made by my client?

A.    Well, I have no idea what his dialogue was with his potential customers or whatever, and I'd love to see that.  I'm not sure it's allowed for us to get it, so I don't know that.  But to my knowledge, that's it.  And then you have the URL that was still on the internet when -- after the first breach and agreement.  So it's -- that's -- that's the article that is in question, I think, in this case.

Q.    So as we sit here right now, the only items that you believe are -- you have an understanding that are defamatory are the -- the content of this article and the URL itself; is that correct?

A.    Well, no, I mean, I haven't seen dialogue between Wolper and the clients, so I -- actually I can't agree to that.  Sorry, I need to see the dialogue.  I don't know what else is said.  If it's -- if I even am able to see the dialogue.

Q.    Okay, well then let's -- let me reframe the question.  When you brought this federal court lawsuit intending to claim damages for defamation, what



Page 28

particular publications did you have in mind as being defamatory at the time you filed?

A.   I -- well, I thought you just asked me, like, Were there other things said that were defamatory?  You guys are asking for text messages between me and Corey. So I have to see, you know, from our discovery if there's any.  But as it stands now, that's all I know about.  But there could be other things I just don't know yet.  So that'll be our discovery, I guess.  If it's allowed.

Q.   Okay.  All right.  So, according to this document, which is again similar to the Exhibit A, you attached the complaint.  There's a date on this of November 21st, 2024.  Do you see that on this document?

A.   I believe you, yes.

Q.   Okay.  When was the article first brought to your attention?

A.   So that's the problem.  I -- I have all the dates, and, actually, Christian has the dates as well. But for this deposition, I'll have to get back to you on that because I don't have -- I don't know by heart.  I don't have those dates at the moment.  So if you want to mark that, I will get you the date.

Q.   Do you have -- as we sit here right now, do you have any recollection as to the first time that you



Page 29

saw or this art- -- strike that.

As we sit here right now, do you have any independent recollection of when this article was first brought to your attention?

A.   Okay.   Are we talking about the first one or the second time?

Q.   We are talking --

A.   Because the first time -- I guess it was -- I'm gonna -- I'm -- just spring of '24, maybe fall of '24.   Maybe.   Yeah, that time frame, not '25.

Q.   Okay.   What we're talking about is the -- the document that I'm showing you right now, the --

A.   Yeah, the -- the blurb that he put out hoping to troll other customers to get into his lawsuit against us.   Yeah, that was either the fall of '24, or the -- I think it was -- it was either early '24 or late -- I -- I don't remember.

Q.   Marking the -- the testimony about trolling.

A.   What does -- what does the date -- what does the date say on the article?

Q.   First, let me -- let me finish my statement. I'm marking the -- the characterization of my client's intent with this article to, quote, Troll people into joining a lawsuit, as non-responsive.   Second, the article --


MAGNA
LEGAL SERVICES

Page 30

A.    I don't understand what that means.  What?

Q.    I'm -- I'm marking it for the record, that's all you need to worry about.

A.    What does that mean?  Okay.

THE WITNESS:  Well, that's -- that's -- that's the -- that's why you put articles out there to try to get customers.  It's called trolling.

THE COURT REPORTER:  Excuse me.  Gentlemen, this is the court reporter.  I'm not physically capable of writing down what people -- two people are saying at once.  Can we please try and speak one at a time?  Thank you.

MR. ERSHOCK:  Absolutely.  Understood.

BY MR. ERSHOCK:

Q.    Second, the date on this article as -- on the document that I'm showing you right now, says November 21st, 2024.

A.    Okay, so the fall of '24.  So, I don't think that article was out there very long before it was brought to my attention, to answer your question.

Q.    Okay.  And in general, would you say that -- or would you estimate that this was brought to your attention within, you know, a month's time?  Was it two months time?  Was it -- well, what -- what is your estimation?

MAGNA
LEGAL SERVICES

Page 31

A.    I guess I have no idea.  I -- I have to look at [Zoom distortion] accounts.

Q.    Okay.

A.    [Zoom distortion] to an exact date, but at the moment, right now, I do not know.

Q.    Okay.  Would you say that it was first brought to your attention in calendar year 2024?

A.    I believe so, yes.

Q.    Okay.

A.    It could have been spring time -- yeah, I think it was -- I mean, it could have been spring '25. I think it's the fall of '24, though, November.  So, around that time, but I know I was -- I [Zoom distortion]...

Q.    How was this article first brought to your attention?

A.    Corey brought it to my attention.

Q.    And do you -- was he -- was Corey working for Lyons Wealth at the time that he brought this to your attention?

A.    Yes.

Q.    Okay.  And what did he tell you about this article when he first brought it to your attention?

A.    We were just astonished at how -- how fake and -- and false it was.



Page 32

Q. Okay. Anything else that he told you about the article at the time he brought it to your attention?

A. No. I mean, I can read, so I read it myself and we discussed it, so...

Q. Okay. Anybody else that you can recall bringing this article to the attention of Lyons Wealth Management in calendar year 2024, other than Corey Roun?

A. I -- I'll have to -- I -- you know, probably, but I have to get you a list of people.

Q. When would you say the first time in calendar year 2025, this article was brought to your attention by someone other than Corey Roun?

A. Yes. So we had a compliance meeting with -- with the Catalyst Funds, and they had a printed copy of it. And they asked me -- asked me [Zoom distortion] about...

Q. Your connection dropped out after -- I got down, Compliance meeting with Catalyst Funds, printed copy, and then I couldn't hear the rest of that answer.

A. Yeah. So one -- one compliance guy is Rob Glass and the other is Fred Schmidt. They brought the article to my attention.

Q. About what day did this compliance meeting occur?

A. I -- I believe April of '25.



Page 33

Q.   April of 2025?

A.   Uh-huh.  I believe.

Q.   And what did they -- what did they ask you about in connection with this article?

A.   They're, like, What's going on?  This is crazy.  Like, what -- what is this article, like, what -- what -- what is -- what is -- who's Wolper?  Like, what's -- this is bizarre.  And we said we were in the process of dealing with it.

Q.   When you say you were in the process of dealing with it, what did you mean by that?

A.   I mean having it taken down because it was full of things that aren't true.  You know, obviously a process.  I think we had already sent a cease and desist or whatever it's called.  So we were in the process of having it removed, which it was finally removed.

Q.   Had you -- prior to the -- the Catalyst Funds meeting -- well, before I even get there, what do you -- what -- what is the Catalyst Funds?  What does that mean?

A.   The Catalyst Funds is an advisor that, basically, we sub advised the mutual fund to.  And we had a partnership with them.  And actually that partnership has been terminated since that article and since the URL was up.  So it's going to be part of the



Page 34

damages of this lawsuit.  We're no longer working with them.  So -- and they -- they directly cited that article, unfortunately, and the URL.

Q.   When did your relationship with -- when did your relationship with Catalyst Funds terminate?

A.   In January, this year.

Q.   January of this year?

A.   Uh-huh.

Q.   All right.  Okay.  So your testimony was that maybe this meeting occurred in April 2025 and that you had already sent a cease and desist letter, had you already?

A.   Again, look, I -- timewise, I'll -- if you want to mark it, I'll get you the exact dates.  That's my rough estimate.  I'm not going to -- that's -- that's my best guess, it's not -- it could be a completely different time, but I believe that's when it was.  I can tell you the exact day that we had that meeting.  I just can't tell you this minute.

Q.   Okay.  Prior to this meeting, to the best of your recollection, had you already sued Mr. Wolper and his firm?

A.   I don't recall whether it had started, but I think we pretty much got after it as soon as we saw it.  So whenever -- from November till whenever it was taken



Page 35

down, it was obviously in -- in -- in motion.

Q.   And you -- you said something, actually, that just -- something that just occurred to me.  You said, that Catalyst Funds is an advisor that you advise mutual funds to.

A.   A mutual fund.

Q.   A mutual fund.  Thank you.  Would you consider -- would you consider Catalyst Funds to be a client of yours?

A.   To a certain extent, yeah, because they hire us to sub advise assets.  So technically, I would say we are a client.  Yeah.

Q.   You are a client of them?

A.   No, no.  They are -- well, it's hard -- it's -- it's a -- I guess -- the word client is -- not sure you could call it that.  It's -- we're hired to manage money.  Yeah.  I guess they're our client and we are their client.

Q.   Do you --

A.   It's a -- it's a mutual agreement to manage money and also to support the fund.

Q.   Okay.  And when you say the fund, I believe you testified earlier, there's between six to --

A.   Write this down no -- no, it's -- it's the -- it's the Catalyst-Lyons Tactical Allocation Fund.



Page 36

Charlie, Tom -- C-L, Charlie -- Larry, T-A-S --

that's -- it's -- that's the ticker symbol of the mutual

fund.

Q.   C-L-T- --

A.   And we were terminated -- yeah, C-L-T-A-X.

And we were terminated in January, citing compliance

issues, which is directly related to this situation.  So

that's lost revenue and lost -- lost business for Lyons

Wealth.

Q.   Okay.  Did Catalyst Funds have any role in the

Lyons Wealth Enhanced Yield Program?

A.   No.

Q.   Was there a response?  I'm sorry.

A.   No.

Q.   No.  Okay.  Understanding that this may be

something that you're going to ask me to refer back to

documents, but, in calendar year 2024, what was the --

excuse me -- the performance of CLTAX in terms of total

return?

A.   The mutual fund?  Oh, man.  I'm not sure.

But, I'd have to look.  I don't recall.

Q.   If I asked you that same question for the

years 2020, '21, '22, '23, '25, would you have the same

response?

A.   I mean, I -- if you want [Zoom distortion] but



Page 37

we've spent four or five star and we [Zoom distortion] -- perform our indexes.  I think we were up 22 percent in '25.  I think we were up, I don't know, 10 percent in '24, up -- up 6, 7 percent in '23, you know, off the look.  You can pull it up yourself on Morningstar.  It tells you exactly what the numbers are.

Q.  Okay.  So something called Morningstar would have that particular --

A.  Yeah, I mean, I can -- I can send you the fact sheet.  It -- if you go to Morningstar and you put that ticker symbol in, you'll see exactly what our performance was.

Q.  Okay.

A.  But definitely strongly positive in '25.  And I believe '24.

Q.  Okay.  All right.  And you stated that you sent a cease and desist letter to -- to Mr. Wolper and his firm; correct?

A.  We did.

Q.  Okay.  Who authored that cease and desist letter?

A.  Me.

Q.  Okay.  And --

A.  Well, Corey and I did it together, basically, yeah.



Page 38

Q.   Okay.   So Mr. Roun had input into the -- the cease and desist letter.

A.   Sure.   Yes.

Q.   Okay.   But if I'm understanding you correctly, you were the signatory.   You were the person who signed their name to the letter.

A.   That's -- that's correct.

Q.   Okay.   If I represent to you that a state court complaint against -- or by Lyons Wealth Management against Wolper Law Firm, PA, and Mr. Wolper was filed on March 3rd, 2025, would you have any reason to disagree with me?

A.   A state complaint?

Q.   A state court complaint.

A.   A state court complaint?   Whether we filed one or not?

Q.   My -- my -- my question is -- is:   Do you have any reason to disagree with me that a -- Lyons Wealth Management filed a complaint in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, against Mr. Wolper and his firm on March 3rd, 2025?

A.   I believe so, I guess, yes.

Q.   Okay.   Well, just -- just so we're clear, I will show you what is attached as Exhibit 3 -- or excuse



Page 39

me, Exhibit C to your complaint.  In fact, and --

A.   Okay, sure.  Yeah.  Okay.  That's -- that's right.

Q.   Okay.  And we -- we see in the upper left corner, it says E filed 03-03 -- 03-03-2025; correct?

A.   Yeah.

Q.   Okay.  So that would -- that would support the conclusion this was filed on March 3rd, 2025?

A.   Yes.

Q.   Okay.  And in this complaint, Lyons Wealth sued Mr. Wolper and his firm for, let's see, defamation, business disparagement, and tortious interference with business relationships; correct?

A.   Yes.

Q.   Okay.  I guess I'll mark that.  Let me just take a second to housekeep.  I'm going to mark the article as Exhibit 1.  If I didn't already.  And I'm going to mark the state court complaint as Exhibit 2.

Okay.  And the state court complaint was ultimately settled; right?

A.   Yes.

Q.   I'm going to mark this document as -- or show you this document that is attached to your -- the complaint that we're talking about now, the -- the current complaint.



Page 40

A.   Okay.

Q.   This is attached to your complaint, as, I guess, Exhibit D, Stock 15.

A.   Yeah.

Q.   Does this look like the -- the settlement agreement between you, you being Lyons Wealth Management, and the defendants, Wolper Law Firm, PA and Mr. Wolper to settle the state court lawsuit?

A.   Yes.

Q.   Okay.  And it was executed by everybody on or about March 19 and 20, 2025?

A.   I guess so.

Q.   Do you see your signature on this doc- --

A.   And it says -- yeah, that's fine.  Yes, yes.

Q.   Okay.  And the date under your signature says March 19th, 2025?

A.   Yes.

Q.   And the same for Mr. Wolper.  Underneath it, it says 3-20-2025?

A.   Yeah.

Q.   Okay.  So this settlement agreement was executed by everybody as of March 20th, 2025?

A.   Yes.

Q.   Okay.  I'll mark the settlement agreement as Exhibit 3.  I note that it is not confidential.



Page 41

Then at that point, following March 20th, 2025, when was the next time that any -- any mention of the article was brought to your attention?

A.   I don't know exactly, but, you know, we -- obviously we're keeping an eye on it.  And we saw that it was still out there, available.  So it was shortly after.

Q.   Certainly, if the Catalyst Funds meeting occurred in April 2025, that would have happened after the settlement agreement; right?

A.   No.  If the settlement was March and the meeting was April, then it was probably right after.

Q.   I believe that's what I said.  But I'll -- I'll -- I'll ask it again -- I'll ask it again, just in case.  If the Catalyst meeting had occurred in April of 2025, that meeting would have been after the effective date of this settlement agreement; correct?

A.   That's right.  Yep.

Q.   Okay.  Any other particular times, that you can recall as we sit here right now, that the article was brought to your attention after March 20th, 2025?

A.   Yeah, I mean, we -- we -- we -- the URL was still out there.  The click in the article.  There was another attorney that has -- had it -- I don't -- I don't know so much display, but it was -- it was



Page 42

available.  So there was several discussions about the fact that it was still floating around the internet and able to -- to -- to be viewed.  And it was also able to be Google searched.  So there were many discussions about it.

Q.  You said that the -- another attorney had it displayed, which attorney -- well, before I ask that question, was that an attorney that you had retained for any legal advice in any way?

A.  No, that was someone like Wolper.

Q.  Someone what?

A.  Someone that practices law, like Wolper.

Q.  Oh.

A.  So yeah, it had -- it was still available to the public, unfortunately.

Q.  What is the --

A.  I'll have to get you the name.  I don't know by heart.

Q.  See -- as we sit here right now, you -- you do not know who the other attorney was who had this article displayed?

A.  I don't know about the word, display, but it was somehow -- yeah, it was -- I'll have to get you that information.  It's another attorney.  Similar to Wolper.

Q.  At the time you had executed the -- the



MAGNA
LEGAL SERVICES

Page 43

settlement agreement, so on or around March 19th, 2025, what --

A.   Uh-huh.

Q.   -- what steps did you take to see if the article had been removed from publication?

A.   I believe we went right to the site and clicked on it, and there was a 404 message, but it also had the URL available still, so it wasn't taken down the way we agreed.

Q.   So around March 19th, 2025, you -- like, somebody -- well, strike that.

On or around March 19th, 2025, someone had gone to the Wolper's website and tried to access the link to the article, and the article returned a 404 error at that time?

A.   I believe so, but the error also had the URL still, so it wasn't fully taken down.  And that's -- that's the second breach.

Q.   Okay.  And even knowing that the URL still existed on March 19th, 2025, you still went ahead on behalf of Lyons Wealth and signed this settlement agreement?

A.   No.  No.  I mean, we signed the settlement agreement, whatever date that was, and then assumed it was gone.  And then, I guess, we saw it again.  So it



Page 44

wasn't before, it was after.

Q.   Okay.  Let me -- let me break this down a little bit differently.  Then in between the time that you filed the state court complaint on March 3rd, 2025, and the time that you executed the settlement agreement on behalf of Lyons on March 19th, 2025, what steps did you take to verify that the article had been removed?

A.   I think we just refreshed our -- our internet on Wolper's website.  I'll have to get you the exact technique that Corey -- Corey, basically is more of the technical guy in this situation, so I can -- I can ask him specifically how we searched it, but it was clearly still available to the public, so I -- if you'd like, I'll get you detail on how we actually found it.

Q.   My -- my question is just the efforts that were undertaken before signing the settlement agreement to verify whether the article was still available on it -- on the website.

A.   I don't -- I -- I wasn't sitting there watching his website, you know, the minute I signed that agreement, I -- I assumed it was taken down.  I think we assumed it was taken down.  So -- but we, obviously, were keeping an eye on it during the entire time.  So there was no before and after.  We kept an eye on it the entire time.



Page 45

Q.   So the -- the person who is -- has any knowledge of the efforts to verify whether the article was taken down or remained up between March 3rd and March 19th, 2025, is Mr. Roun?

A.   That's right.

Q.   Okay.  Independently of any actions that were taken to verify whether the article existed before -- or, excuse me, between March 3rd and March 19th, 2025, Lyons Wealth Management executed the settlement agreement; correct?

A.   I'm not going to agree to the time frame because I'm -- I don't have the exact dates.  So I'm not agreeing to that.  I'm not going to -- I told you, I don't have a timeline.  I will get you the number and the date.  But I'm not -- sorry, I don't agree.

Q.   Returning back to what we've previously marked as Exhibit 3, you would agree that the date below your signature on behalf of Lyons Wealth Management says March 19th, 2025; correct?

A.   Yeah.  Okay.  I -- I -- like I said, if I sign something on the day, I agree to that.  If it's in a document, you're asking me, like, what day we looked at the article, what day we didn't, when it came up, when it came down.  I don't know, I can't agree to that.  So I'm not agreeing to dates that I can't see or I can't



MAGNA
LEGAL SERVICES

Page 46

confirm right now.  I agree that I signed that form, that's it.

Q.  Okay.  So in other words, you signed this settlement agreement on behalf of Lyons Wealth Management, without knowing one way or the other whether the article had already been removed?

A.  Absolutely not.  I didn't say that.  I said: I don't have the exact dates of when we saw the article up and down.  That's all I said.  I don't agree to anything before or after, datewise.

Q.  So on March 19th, 2025, did Lyons Wealth Management have any knowledge as to whether the article had been removed or not?

MS. KADAM:  Object to form.

THE WITNESS:  Is that the date --

MR. ERSHOCK:  What's the objection?

MS. KADAM:  Asked and answered.

BY MR. ERSHOCK:

Q.  Okay, you can answer, Mr. Read.

A.  Answer what?

Q.  On March 19th, 2025, did Lyons Wealth Management have any knowledge as to whether the article had been removed from Mr. Wolper's website?

A.  I don't know.

Q.  Okay.



Page 47

MR. ERSHOCK:  We have been going for just about an hour.  I know that the videographer generally likes to change the tapes around this time.  We can take five minutes and be right back.

THE VIDEOGRAPHER:  Off the record, 11:13.

(A short break.)

THE VIDEOGRAPHER:  On the record, 11:19.

BY MR. ERSHOCK:

Q.   Mr. Read, before we -- we went to break just a second ago, we were talking a little bit about Catalyst. In the process of Catalyst ending their relationship with Lyons Wealth Management.  Did they -- were they required to provide, like, any advance notice that the relationship would be ending?

A.   Yeah, 60-day notice.

Q.   Okay.  Did -- did that notice have to be in writing?

A.   I believe so, yes.

Q.   Do -- are you presently aware of whether Catalyst complied with this notice requirement for terminating the relationship?

A.   Yes.

Q.   Did you answer, sir?

A.   I said yes.

Q.   Okay.



MAGNA
LEGAL SERVICES

Page 48

A.    [Zoom distortion] for us.  We didn't terminate them.  Did you hear that?

Q.    They -- they ended the relationship with Lyons.

A.    [Zoom distortion.]

Q.    You were cutting in and out, again.

A.    Yes.  They did.  They terminated the relationship with Lyons.

Q.    All right.  And to the best of your recollection, they did so in writing?

A.    Yes.  I can give you that document.

Q.    Okay.  Who is the -- the contact person that -- from Catalyst who -- who you were communicating with about the potential end of the relationship?

A.    Jerry Szilagyi is the CEO of Catalyst, but they have a trust and a board of directors.  So their attorneys and me.

Q.    The -- did the attorneys send the letter on behalf of Catalyst?

A.    Yes.

Q.    Okay.  I'm just going to guess that you probably don't know the name of the firm off the top of your head?

A.    Law firm is Thompson Hine.  And, yeah -- so that's right -- JoAnn Strasser is the attorney.


MAGNA
LEGAL SERVICES

Page 49

Q.   All right.  Returning back to the actual article, since we're, kind of, at a good spot, we were talking about the state court lawsuit.  We were talking about the settlement agreement.  We were talking about it being out there.  I guess this is as good of a time as any to refer back to the article and ask you about its contents.  So, what -- to the best of your recollection, what in this article does Lyons Wealth consider to be a defamatory statement?

A.   [Zoom distortion.]

Q.   I didn't -- I didn't get that answer.

A.   It's listed in our complaint and I don't know them by heart.  So I -- I can't -- I can't answer those questions at the moment.  If you want to read it to me, I will be happy to answer whatever questions you have about what you read.

Q.   All right.  We will go through sentence by sentence.  Okay.  The title of the article is called, Wolper Law Firm, PA, investigates the Lyons Wealth Management, "Lyon's Enhanced Yield Program." Do you consider that statement to be defamatory?

MS. KADAM:  Object to form.

THE WITNESS:  I do in a way, because when does the law firm investigate the firm; right?



Page 50

BY MR. ERSHOCK:

Q.   Okay.  You consider --

A.   It implies -- it implies that we're under investigation, which is ridiculous, by Wolper, who's not an investigator.  That I know of.  Is he -- is he an investigator?

Q.   He's -- the statement implies that the law firm is investigating you.  Is that what you just said?

A.   Yes.

Q.   Okay.

A.   Like, since when does a law firm investigate? Like, I'm investigating your personal -- like, yeah, it's not a -- it's a negative -- a negative connotation.

Q.   It's a negative connotation.  Do you have any knowledge one way or the other, whether Wolper Law Firm, PA, was actually looking into, or investigating, if you will, the Lyons Enhanced Yield Program?

A.   I don't know, but it sounds like he might have been, but it is -- I don't think he's an investigator, he's a lawyer.  An investigation would be something like the SEC would do, or some sort of financial oversight, but I don't -- I don't see a law firm being an investigator.  So I think that language is defamatory, yes.

Q.   Okay.  So it's the testimony of Lyons Wealth



Page 51

Management that law firms cannot investigate, only government agencies can investigate?

A. That's not what I said.

Q. Okay. Then what did you mean by saying --

A. I think that if you -- if I say I'm investigating your personal finances or I'm investigating where you were Friday night, I don't think it's a positive connotation.

Q. Regardless of the connotation. Does it -- can one state that they are investigating something and --

A. It's a free country, I guess they can, yeah.

Q. Okay. Does the title of the article state that any government entity is investigating the Lyons Wealth Management -- Lyons Enhanced Yield Program?

A. [No audible response heard.]

Q. Was there an answer?

A. I said no.

Q. No. Okay. So what then formed the -- what then formed Lyons Wealth Management's opinion that an investigation can only come from a -- a government entity?

A. I didn't say that. What I said was: It implies some sort of investigation. And, I guess, a law firm can investigate things. But I think it's a bit odd of a way to -- to title an article. Like, we're



Page 52

investigating your personal tax return.  You know, if -- if I'm the IRS, I think that makes more sense than from a law firm, but that's my opinion.

Q.    The first sentence of the article says Wolper Law Firm, PA, is investigating SEC registered investment advisor, abbreviated RIA, Lyons Wealth Management, LLC. Do you consider that statement to be defamatory?

MS. KADAM:  I'm going to object to form on all of these questions because it calls for legal conclusion, but you can answer.

MR. ERSHOCK:  I -- respectfully, your client is suing for defamation, so he's going to have to identify the particular statements, the publications that it believes is defamatory.

MS. KADAM:  I understand, but it also calls for legal conclusion.  So just to the -- to that extent, I'm going to object to all those questions. But he could still answer.

THE WITNESS:  No, I mean, I'm not going to answer that.

BY MR. ERSHOCK:

Q.    You're not going to answer that?

A.    I guess.  I mean, if that's what my attorney tells me to do.

MS. KADAM:  No, I said, you can still answer,



Page 53

but I'm objecting to the extent that it calls for legal conclusion.

THE WITNESS: Yeah, I think if -- you know, if I say I've terminated Wolper Law Firm or we're investigating Wolper Law Firm, that's not a positive -- you know, it doesn't -- it's not a positive sounding language, in my opinion.

BY MR. ERSHOCK:

Q. Can something be true and not positive sounding at the same time?

A. I'm sure it can be. But in this case, the entire article, if you take it not sentence by sentence, but in its overall format, it's very defamatory.

Q. Well, that's what we, kind of, have to do here. We have to take it and find out what parts of it you consider to be defamatory, so that we can find out what the overall defamatory context is. And because -- unfortunately, because you're in transit right now, I would normally have you read this and identify it. But we're working with what we've got here.

A. Yeah. Okay. So what's -- what's your name? Sorry?

Q. My name is Alex Ershock.

A. So if I say Lyons Wealth is investigating Alex Shurecock [verbatim], whatever. You know, I don't think



MAGNA
LEGAL SERVICES

Page 54

that's -- that's an article that's sent to the public. I don't think that's very positive to you?

Q. Okay. Would you consider the first sentence that we just read to be defamatory for the same reasons that the title of the article you consider to be defamatory?

A. [Zoom distortion.] Article -- otherwise -- sue; right?

Q. I didn't get any of that answer.

A. I -- I, obviously, think it's defamatory overall in the article, and sentence by sentence, otherwise we wouldn't have sued. Of course it's defamatory. That's my opinion. Did you get that?

Q. I did. Just typing some notes. The next sentence says, According to its most recent Form ADV, Lyons Wealth Management LLC, which is based in Winter Park, Florida, manages 160 million in assets. Do you consider that statement to be defamatory?

A. No.

Q. Okay. Do you consider that statement to be false or misleading in some way?

A. That particular sentence is true.

Q. Okay. The next sentence says, One subset of its business involves options trading through a proprietary options trading program titled, "Lyons



Page 55

Enhanced Yield Program." Do you consider that statement to be defamatory?

A. It's -- it's not defamatory, but it's not accurate. It's not proprietary.

Q. Okay.

A. Proprietary is incorrect. So if incorrect is defamatory, then it is defamatory. And it shows that, clearly, Wolper didn't -- had no idea what we were actually doing, which makes it also defamatory.

Q. Is the gist of the sentence true? So if we remove the word proprietary from that sentence and it said, One subset of its business involves options trading through a -- through an options trading program titled, "Lyons Enhanced Yield Program." Would that sentence be true?

MS. KADAM: Object to form.

THE WITNESS: It wasn't -- it's not completely true because we didn't always trade options. It's not just options. So that's also not quite accurate. That whole sentence is not quite accurate.

BY MR. ERSHOCK:

Q. Does the Lyons Enhanced Yield Program involve options trading?

A. [Zoom distortion].


MAGNA
LEGAL SERVICES

Page 56

Q.   I didn't get that.

A.   Yes, it can have options but not [Zoom distortion] false.  And options.  And it wasn't a yearly option program.  Options were [Zoom distortion]...

Q.   Mr. Read that whole testimony broke up very badly, I heard --

A.   Holy shit.  Okay.

Q.   -- maybe, maybe six or seven --

A.   Can you hear me now?

Q.   Yeah.

A.   Okay.  The -- the options are a part of the [Zoom distortion] options.  We don't always trade options.  So that whole [Zoom distortion] incorrect.  And therefore because what we're in the [Zoom distortion.]

MR. ERSHOCK:  Counsel, it seems like your client's connection here is going to be a significant issue for -- for parts of this deposition that are, kind of, strike at the real heart of this complaint here.

A.   -- now?

Q.   We did not.

MS. KADAM:  Also, Alex, do you mind zooming in on the article?

MR. ERSHOCK:  Yeah.



Page 57

MS. KADAM:  Thank you.

MR. ERSHOCK:  Is that good?  Do you need it more?

MS. KADAM:  Try a little more.

MR. ERSHOCK:  Oh, that's way too much.

MS. KADAM:  Okay.  No, this is fine.  This is fine.

MR. ERSHOCK:  Let me see.  How's that?

MS. KADAM:  That's good.  Thank you.

MR. ERSHOCK:  Okay.  It looks like he's frozen.

THE COURT REPORTER:  Would you like to go off the record until we get that resolved, sir?

MR. ERSHOCK:  Yes.

THE VIDEOGRAPHER:  Off the record, 11:35.

(A short break.)

THE VIDEOGRAPHER:  On the record.  11:37.

MR. ERSHOCK:  Mr. Court Reporter, could you read back the previous question that was attempting to be answered before we had connection issues?

THE COURT REPORTER:  Stand by one moment, sir.

(The requested portion was read back by the court reporter.)

THE WITNESS:  [Zoom distortion] But not all.  Yeah.  Okay.  Is that a question for me?



Page 58

BY MR. ERSHOCK:

Q.   It is.

A.   In some -- in most cases it is, but not all cases.  And it's also not proprietary.  I mean -- it's -- proprietary means, you know, it's a secret formula or whatever.  It's not.  Nothing we trade is a secret in that particular program.  So those -- that sentence is -- has two incorrect statements, or whatever you want to call it.

Q.   Okay.

A.   So the description of our program in that sentence is inaccurate.  And in my opinion, that makes it defamatory, because it's not even correct.

Q.   So any statement that has any inaccuracies whatsoever is defamatory?

A.   I didn't say that.  You just did.  If you describe a program that is proprietary in options trading, but it actually isn't all the time, or at all, that's not true.  And therefore it's defamatory.

Q.   Why is the title of the program the Lyons Enhanced Yield Program?

A.   Enhanced as in leverage.  It's also called the Leveraged Yield Program.  And the goal of the program is to enhance the yield of a regular portfolio using margin and leverage.



Page 59

Q.   Are you copying someone else's strategy in the Lyons Enhanced Yield Program?

MS. KADAM:  Object to form.  You can answer.

THE WITNESS:  I'm not copying, no.  I mean, we -- the -- the strategy -- if you -- there's about 30 different option strategies available to the public.  And there is a sequence of trading you can do, based on your market vision, client risk tolerance.  And so none of the trading itself is proprietary.  There's probably other firms that trade like us, but I don't know of them.

BY MR. ERSHOCK:

Q.   Is the title of the program, the Lyons Enhanced Yield Program, is that trademarked?

A.   No.  And we call it Leverage Yield.  We call it Yield.  We call it Enhanced Yield.  It's -- it's -- it's had different names over the -- over time.

Q.   In every iteration of the name, does it have the word Lyons in it?

A.   I mean, I might call it Yield, I might call it Leverage Yield or Lyons Yield, but it doesn't -- I mean, if I write an email to a client that's in the yield program, I don't call it the Lyons Yield.  I call it Yield.

Q.   But you hold it out to the general public as



Page 60

the Lyons Yield Program, Enhanced Yield Program, Leveraged Yield Program, whatever it happens to be, it has Lyons in it?

A.   From a marketing point of view, yes.

Q.   Okay.  All right.  The next sentence says, The Wolper Law Firm has heard from clients of Lyons Wealth Management who have experienced investment losses as a result of this proprietary strategy.  Do you consider this statement defamatory?

A.   Yes, because the main guy that contacted Wolper is Avi Cohen.  And Avi Cohen was upset.  I think that some of his buddies lost money, but Avi Cohen made money.  And again, it's not a proprietary program.  So, yes, that sentence is incorrect.  The clients that he reached out to, a couple of them actually made money.  So that's incorrect and defamatory.

Q.   Did they -- do you know whether any of the clients who contacted the -- well, strike that.  Let me back up.

So you understand that there were former clients of Lyons Wealth Management who did contact the Wolper Law Firm?

A.   That I can't confirm.

Q.   So you don't know one way or the other whether clients contacted the law firm?



Page 61

A.   I don't -- I don't know whether he contacted them or they contacted him.  Obviously, someone found Wolper, and I think it was Avi, but how the contact was made after that, I don't know.

Q.   Okay.  And what's your understanding of the number of people -- well, strike that.  Let me back up one step.

Did the Wolper Law Firm bring any litigation against Lyons Wealth Management?

A.   They tried.  He tried to go to Triple A, but we didn't agree to the terms of Triple A, so it didn't happen.

Q.   The -- but they did attempt to initiate litigation against Lyons Wealth Management?

A.   I believe so, I mean, yes, but it failed.

Q.   Okay.  And was it just one person or was it more than one person?

A.   It was Avi and his three buddies and then a couple, I think, another two customers of ours, Mark Bunker and someone else.

Q.   Okay.  So to the best of your recollection, Lyons Wealth Management was the subject of five or six attempted arbitrations against the firm itself?

A.   I -- yeah, exactly, the word attempted, there was no arbitration.



Page 62

Q.   Okay.  Do you -- as we sit here right now, do you have any idea one way or the other, whether every individual who brought a claim against Lyons Wealth Management, brought by the Wolper Law Firm, made money as a result of the enhanced yield program?

A.   I'll have to double check.  But 100 percent Avi Cohen made -- made money.

Q.   The question was -- I'm sorry.  Continue.

A.   No.  That's okay.  Go ahead.

Q.   The question was:  Did every person who attempted to bring an arbitration against Lyons Wealth Management, brought by the Wolper Law Firm, make money as a result of the Lyons Enhanced Yield Program?

A.   No.

Q.   Okay.  So it's true then, that some clients of the Lyons Wealth Management program who brought a -- an arbitration claim, or attempted to bring an arbitration claim through the Wolper Law Firm, lost money as part of the Lyons Enhanced Yield Program?

A.   Well, when you say lose money, if you -- if you stop trading and it is in a losing position.  [Zoom distortion.]  But that doesn't mean we lost the money. If you -- if you program out with losing positions, that's your -- that's your decision.  So I'm not going to agree to that.  And Avi Cohen made money and another



Page 63

client, Yuval [phonetic], he didn't lose money, but he -- he was taking so much money out to live on that he couldn't really participate in all the trades.  So I don't even -- I don't think he lost money, but -- so there's -- it's a mixed group of people.  Some people lost money and some people were up and they lost money because they -- they decided to close out.

Q.   They decided to -- well, do you have any idea why they decided to close out?

A.   I guess they didn't want to continue trading.  But that was their decision.  And if you read our investment advisory contract, that makes them liable for any losses.

Q.   Okay.  And they -- did they decide to stop trading because the trades that were being made on their behalf were not making any money?

A.   They -- I didn't get a reason.

Q.   Okay.  The next sentence of the article states that, The Lyons Enhanced Yield Program is dubbed by Lyons Wealth Management as an income overlay strategy, in which the customer pledges stocks to be used as collateral for a margin loan.  Do you consider this statement defamatory?

A.   I never had a conversation with Wolper before he published that article of anything that I dub.  So


MAGNA
LEGAL SERVICES

Page 64

yes, it's defamatory.  I don't dub things with Wolper,
so I don't know where he got that.  It's like a quote.
That's not quite a quote.  I didn't dub anything to him.
So yes, it's defamatory.

Q.   What about this particular statement is false?

A.   I never had a conversation with Wolper to dub
anything with him.  So the whole sentence is -- is
false, because I don't -- I didn't dub anything with
Wolper.  I don't know -- like, we had a chat and that's
how I dub my program.  I never -- I never said that and
I never dubbed it.

Q.   Must everyone confirm a statement with you
before publishing it?

A.   I don't dub things and I don't dub my program,
and I certainly never had a conversation with Wolper
about what I dub my program.  So it's almost a quote
that is definitely not true and defamatory, in my
opinion.

Q.   What makes you think this is a quote?

A.   I don't know.  If I -- he says dub, it's not a
quote, but it's, like, somehow he knows my slang for the
program.  It's -- it's -- I never had a chat with him,
so I don't know where he gets the word dub, but we dub
our program.

Q.   So you're taking issue with a specific verb



Page 65

choice here?

A.   Yeah.

Q.   Correct me if I'm wrong, but didn't you describe the enhanced yield program as an income overlay earlier in this deposition?

A.   Yeah.  [Zoom distortion] you.  Did himself, like, [Zoom distortion] you and I have had a conversation.  I never had a conversation about it with Wolper beforehand before he published that article.

Q.   Was the Lyons Enhanced Yield Program something other than an income overlay strategy prior to the time this article was published?

A.   You know, that is a brief description, but obviously there's a lot more to it.  So, I don't summarize my entire program with, like, three words.  It's a generalization of what we do, but it's obviously much more detailed and complex.  And it's not proprietary.

Q.   Okay.  Do you consider anything about this statement false or misleading?

A.   What statement?

Q.   The one that we've been talking about, the one that starts with, The Lyons Enhanced Yield Program.

A.   Yeah.  Because in my opinion, like [Zoom distortion] had it up with Wolper.  And that's how I



Page 66

described it.  And I never talked about the strategy for him to go out there.  And if that description is defamatory, we've never, ever with [Zoom distortion]...

Q.   You were breaking up.

THE COURT REPORTER:  Excuse me, I'm having a real hard time hearing the witness because of the Zoom distortion and the breakups.

THE WITNESS:  I'm going over a bridge.  I'll be off the bridge in a second.

MR. ERSHOCK:  Could we just suspend this until you get to your destination?  Then we can continue from there.

THE WITNESS:  I'll be -- I'll be there in, like, five minutes.

MR. ERSHOCK:  Okay.  Let's go off in five minutes and then tell us off the record when you arrive.  And then we can restart.

THE VIDEOGRAPHER:  Off the record, 11:51.

(A short break.)

THE VIDEOGRAPHER:  On the record, 12:08.

MR. ERSHOCK:  Mr. Court Reporter, was there a question pending at the time of the breakup?  I don't remember.

THE COURT REPORTER:  One moment, sir.  The last portion of the record reads as follows.



Page 67

(The requested portion was read back by the court reporter.)

MR. ERSHOCK: Okay. So that sounded like a clarifying question. What was -- what was the question before that?

THE COURT REPORTER: Standby. I would have to go back two questions to make it clear.

(The requested portion was read back by the court reporter.)

BY MR. ERSHOCK:

Q. Okay. So I guess I'll just, for clarity of the record, I'm going to ask that question again. Mr. Read, turning back to where we just were. Do you consider any part of the sentence, The Lyons Enhanced Yield Program is dubbed by Lyons Wealth Management as an income overlay strategy, in which the customer pledges stocks to be used as collateral for a margin loan. Do you consider any part of that sentence to be false or misleading?

A. It's misleading because, again, it's -- it's summarizing our program -- I would never -- you know, I've never spoke to Wolper, so there's no dubbed. I find that misleading. And also proprietary is not correct. And it's not always pledged assets. It's not always margin, and it's not always option. So it's --


MAGNA
LEGAL SERVICES

Page 68

it's -- it's an incorrect sentence, which I find, therefore, defamatory.

Q.   Okay.

A.   He could have quoted our marketing materials and been accurate, but he made the sentence up himself, I guess, and -- and saying that we dub something which I've never agreed to or told him that's what we dub it. So I do find that sentence defamatory, yes.

Q.   Okay.  Speaking of your marketing materials, I will mark as Exhibit 4 this document, which is entitled the Lyons Enhanced Yield Program Understanding Your Statements and Cash Flow.  Have you ever seen this document before?

A.   Yep.

Q.   Did Lyons Wealth Management create this document?

A.   Yes.

Q.   Okay.  So it's responsible for whatever is in- -- included in this document?

A.   We'll have to see what it -- yeah, more or less, yes.

Q.   Okay.  And this is -- are these market- -- is this a -- something that comprises your marketing materials for the Lyons Enhanced Yield Program?

A.   No, I think this is more for current clients.



Page 69

This is actually not marketing, now that I look at it. This is for clients that are already clients that -- to understand how the -- the interactive brokers statements are incredibly hard to follow.  So there's a question of like, What's my dividend?  What's the cash flow?  So this actually is not marketing.  It's actually -- it's for a client to understand how to read the statement.

Q.   So the -- instead of marketing, would it be better to describe this document as educational materials?

A.   Just for the clients, yes.

Q.   Okay.  And it's education for the Lyons Enhanced Yield Program?

A.   Yes.

Q.   Okay.  Then we go to Page 2.  And in the lower right hand corner, the -- it actually describes the -- or has the -- the words Lyons Overlay Yield Program.  Do you see that?

A.   Where?

Q.   The lower --

A.   Yes.

Q.   Okay.  And that actually continues for the -- up until Page 8; correct?

A.   Okay.

Q.   You agree?



Page 70

A.   I'm looking at it, yep.

Q.   Okay.  And then on Page 9 there's just the title.  And then on Page 10, in the lower left hand corner, it says the Lyons Enhanced Yield Program.

A.   Correct.  It doesn't really matter.  But yep. It's all the same.

Q.   It's the same thing.  All right.  And then this -- this --

A.   Well, it -- it is and it isn't because overlay is if you have a single stock position, like -- like, again, I use the Microsoft.  Whereas the yield could also be on cash.  So there is -- there is a slight difference.  But from a jargon point of view, it's roughly the same.  I mean, it's -- it's a similar -- it's a program we managed overall, but -- but there -- in some cases it was more overlay in other cases.  So, okay, keep going.

Q.   The -- the second sentence of this page that says disclosure says, The Lyons Income Overlay is intended for holders of large equity or other concentrated holdings who seek to earn option premium income over and above the dividends or interest payments generated from their existing underlying holdings; do you see that?

A.   Yep.



Page 71

Q.   Okay.  And this -- that sentence appears in educational materials about the Lyons Enhanced Yield Program?

A.   Yeah.  Well, it's also -- the overlay is a little different because overlays on a single stock position and yield is on cash.

Q.   But you would agree with me that you used the phrase Lyons Income Overlay in materials that were designed to educate clients on the Lyons Enhanced Yield Program; correct?

A.   But it's both the enhanced yield and the overlay.  It's almost exactly the same concepts, but it's a slightly different -- different program.

Q.   So you did use income overlay in materials relating to the enhanced yield program?

A.   It's -- it's -- they're, like, very similar trading strategies, yes.

Q.   Okay.

A.   Hang on I gotta ask...

(Witness spoke to people outside his vehicle, asking directions.)

THE WITNESS:  Sorry about that.

BY MR. ERSHOCK:

Q.   Okay.  No problem.

A.   Okay.  So what's your question?



Page 72

Q.   I, again, returned to the sentence that says, The Lyons Enhanced Yield Program is dubbed by Lyons Wealth Management as an income overlay strategy, which reads in part.  So I -- my question is -- is:  What part of that sentence that describes the enhanced yield program as an income overlay strategy is untrue?

A.   Well, if you're asking yield -- yield is on cash and overlay is on a single stock position.  So I don't know which one you're asking about.

Q.   So the -- the only difference here is the method in which the income overlay strategy is used.

A.   If you have cash, okay, technically, you deposit cash.  It would be the yield program.  If you have a large stock position, it's technically the overlay, but very similar strategies.

Q.   So it's substantially true that the Lyons Enhanced Yield Program can use an income overlay strategy?

MS. KADAM:  Object to form.

BY MR. ERSHOCK:

Q.   You can answer.

A.   I don't know what you're asking.

Q.   Is a subset of the Lyons Enhanced Yield Program the use of an income overlay strategy?

A.   Not really.  It's -- it's -- since none of



Page 73

it's really defined that way, I -- you know, I -- I can't really agree to what you're saying.  I don't -- I don't really know what you're asking even.

Q.   I think it was pretty clear what I was asking. I was asking if, as you describe in your client education materials, whether the use of an income overlay strategy is part of the enhanced yield program?

A.   It's not part of it.  It's -- it's -- it's -- it's the -- the, I guess, the lingo we use to describe, in general terms, the strategy for both yield and overlay.

Q.   Then my question is this:  What is the purpose of including a disclosure statement for the Lyons Enhanced Yield Program that describes the same program as an income overlay?

A.   Well, I don't know.  What's the question?

Q.   If you are saying -- if it is your testimony that the Lyons Enhanced Yield Program does not use -- is not, in part, an income overlay program, why then is that in the -- in the client education materials about the enhanced yield program, where you, as Lyons Wealth Management, describe a program at the Lyons Income Overlay?

A.   Because it's very similar.  So you might have a person reading this that has a single stock position,



Page 74

and you have another person reading it that's deposited cash. They're -- they're slightly different, but the descriptions roughly the same. I don't know really what you're getting at here.

Q. That's all I needed. Thank you.

A. Okay.

Q. The next sentence says, The loan proceeds are then used to purchase additional securities that are designed to generate dividends. Do you consider any part of that statement to be false?

A. No.

Q. Do you consider any part of that statement to be defamatory?

A. In the context of that -- that disclosure in my materials, no.

Q. Okay. The next sentence says, Those dividends are expected to generate a 12 to 14 percent annual cash flow, plus any appreciation of the underlying securities. Do you consider any part of that sentence to be defamatory?

A. That's the goal of the program. That's not a guarantee.

Q. Does it say anywhere that it's guaranteed?

A. No.

Q. Okay. So the question I asked you is: Do you



Page 75

consider any part of that sentence to be defamatory?

A.    Not in the context of the disclosure.

Q.    Do you consider any part of that statement to be false or misleading?

A.    No.

Q.    Okay.  The next sentence says, Lyons Wealth Management assures clients that they will "hedge" underlying positions to ensure that if the collateral declines in value, the risk of a margin call remains low.  Do you consider any part of that statement to be defamatory?

A.    Not in the context of the disclosure.

Q.    Do you consider any part of that statement to be false or misleading?

A.    No.

Q.    The next sentence says, Lyons Wealth Management further represents that the, quote, unlike covered call or other strategies in which the underlying stock is pledged and at risk of assignment or forced sale by the options clearing corporation, clients in the enhanced yield strategy are not exposed to the risk of assignment.  Do you consider any part of that sentence to be defamatory?

A.    No.

Q.    Do you consider any part of that sentence to



Page 76

be false or misleading?

A.   No.

Q.   The next sentence says, Pursuant to marketing materials distributed to clients, Lyons Wealth Management represents to clients that the yield strategy is designed to, quote, ring the proverbial dividend cash register.  Close quote.  Close quote.  Do you see that?

A.   Yep.

Q.   Do you consider any part of that sentence to be defamatory?

A.   No.

Q.   Do you consider any part of that sentence to be false or misleading?

A.   No.

Q.   The next part of the sentence -- or the next sentence says, As it turned out, the representations made by Lyons Wealth Management did not come to fruition and investors lost substantial sums of money.  Do you consider any part of that statement to be defamatory?

A.   Yes, because again, Wolper's customers actually made money, some of them.  So it's -- it's -- it's a blanket statement that's defamatory and not true.

Q.   When you say some of them made money --

A.   And -- yeah.  Anyway --

Q.   I'm sorry, were you finished with your answer?



Page 77

A.   Yeah.

Q.   Okay.  When you say some of them made money, does that mean that all of them made money?

A.   Is -- is some and all the same word?  No.

Q.   Okay.  Do you consider any part of that statement to be false or misleading?

A.   Yeah, yeah.  Read it again.

Q.   As it turned out, the representations made by Lyons Wealth Management did not come to fruition, and investors lost substantial sums of money.

A.   Yeah, that's not true.

Q.   What part of that sentence is false?

A.   We'd have to go through every single client that Wolper represents for me to show you that.  But if a client made money and then Wolper says they all lost money, that's not correct.  And that's defamatory, isn't it?

Q.   Where does it say that everybody made money?

A.   You just said all.

Q.   I just said all?  I believe I just read the sentence, but I'll read it again.  As it turned out, the representations made by Lyons Wealth Management did not come to fruition, and investors lost substantial sums of money.  Where's the word all in that sentence?

A.   Yeah, that's not -- that's -- that's -- that's



Page 78

inaccurate -- that's inaccurate and defamatory.  That sentence, 100 percent.  And I will give you some context.  So I talked to Wolper and I documented the conversation.  He didn't even know whether Avi Cohen -- he thought Avi Cohen had lost money.  And that was really the -- the -- the bigger client that we discussed in a call with Wolper, he -- he said that Avi Cohen had lost money.  And the reality is Avi Cohen had made $1.8 million as our customer.

So clearly, Wolper didn't even know when he published that article whether the clients had made money or not in the program.  And I can confirm that that's exactly what we had a conversation about.  And he was surprised that Avi had made money.  So he had written this entire article, claiming all the clients had lost money.  When his biggest customer and the leader of this group from Israel -- okay, actually, the guy had made a substantial amount of money as our client.

So that sentence is completely false, it's inaccurate, and it's defamatory because the reality of the customers that were under his wing, a couple of them had made money, especially Avi Cohen.  So that sentence is defamatory, it's inaccurate, and it was not researched by Wolper.  So when we started going through



Page 79

the interactive broker's statements, he didn't even realize that they had made money.  So this whole article was written based on, my guess is, on a conversation with Avi Cohen, when he told Wolper he had lost money, and the reality is he had made money, and that makes this entire article false and defamatory, which is why he agreed to take it down.

Q.   Okay.  There's -- there's a lot there, but --

A.   There is.

Q.   My -- my first question is -- is:  Where in that sentence does it represent that everyone lost money?  All people lost money?

A.   But that's exactly how the sentence reads. You can -- you can -- you can argue with me like lawyer style, that that's not what it says.  In my opinion, that's exactly what it says.  All clients made money -- or lost money, and therefore the program is bad.  It's a very general statement.  If you want to -- if you want to spin that -- that somehow, it's not including all of Wolper's clusters -- customers, you can do that yourself.

Q.   Mr. Read, where in that sentence that starts with, As it turned out, does the word all appear?

A.   Read the sentence.

Q.   I've read it three times.  You can go ahead



Page 80

and read it for yourself.  Actually --

A.   To me it's all inclusive.  It's -- you know what?  I've heard it.  It's all inclusive.  It sounds like all the clients that he quote/unquote, investigated, had lost money.  And I know for a fact he didn't realize that Avi Cohen had made money.  And that's after the article was published.  So that sentence is incorrect and it's defamatory.  His client made money.  He didn't even realize it, because he couldn't read the interactive brokers statements.  And we discussed that on the phone.

Q.   What documents would support the claim that you're making that Mr. Cohen made money?

A.   I'll send you the statement if you'd like. He's up -- he was up 1.8 million when he left.  So it's completely wrong, that sentence.  And he wrote it -- he wrote it before he realized that it was incorrect.

Q.   And when you say statements --

A.   And published it.

Q.   -- what kind of statements are you referring --

A.   Avi Cohen's performance -- Avi Cohen's performance statements, which I don't think Wolper had the skill to read.  He basically assumed what Avi told him was true was that he lost money.  But the reality is



Page 81

he made money, and Wolper didn't realize that until after this article was published, which is why he took it down, because he knew he was incorrect.

Q. And those statements that you're talking about, from Mr. Cohen, those would also show whether any other of Mr. Wolper's clients made or lost money?

A. No. Every client statement is for the client themselves. So every client has their own separate statements. But it was clear to me that Avi Cohen had convinced Wolper that he had lost money for all of his clients based on whatever this marketing stuff you're looking at. But the reality was Avi Cohen, and I believe Yuval made money, and maybe one other guy. So -- so -- he -- he published this article without even realizing that that's -- that sentence is completely wrong and that not all of his customers had lost money. So that's exactly the problem.

Q. Do you recall whether Mr. Cohen sued you?

A. Excuse me?

Q. Do you recall whether Mr. Cohen sued Lyons Wealth Management?

A. No, not personally. I mean, he was working with Wolper.

Q. Well, just because --

A. And actually -- and actually, when he



Page 82

realized -- when Wolper realized that Avi had made money and not only did this article come down, but then Avi was no longer a claimant or whatever you want to call it, because -- because you can't really sue someone if they've made money.  So unfortunately for Wolper, he should have read the statements before he made the statement that you just read.  I've got a -- I'm in the wrong spot.  So I got to start moving to this other spot.

Q.   Go ahead and move.

A.   Yeah, I mean, I have to find it.  Keep going.

Q.   So this statement that we're talking about that the representations did not come to fruition.  And investors lost substantial sums of money.  Does that sentence encompass more people than just Mr. Cohen?

A.   Yes, it does.

Q.   Okay.  So if there is --

A.   It's a generalization -- it's a generalization.  That's not true.  And we can -- we can -- we can dance around this sentence all you want.  It makes it sound like all the clients lost, despite what the marketing material said.  And that's completely incorrect.  And it's false and it's defamatory.

MR. ERSHOCK:  Okay.  Mr. Videographer, do you need to change the -- the tape?



Page 83

THE VIDEOGRAPHER:  No, sir.

MR. ERSHOCK:  Okay.  We'll continue.

BY MR. ERSHOCK:

Q.   The next sentence of this article says, Lyons Wealth Management is a fiduciary.  Do you see that?

A.   Yes.

Q.   Do you -- do you contend that this statement is defamatory?

A.   What statement?

Q.   Lyons Wealth Management is a fiduciary.

A.   That's true.

Q.   Okay.  Do you contend that it is false or misleading in any way?

A.   No.

Q.   Okay -- okay.  This next sentence is going to be a little bit tricky to read because there is something in the middle of it, but, it says, The SEC and courts across the country have interpreted the fiduciary duty -- then it breaks up and says, By the Advisers Act and have found that advisors owe both a; one, duty of care and; two, a duty of loyal.  The word loyalty cuts off.  So --

A.   Okay.

Q.   My question is:  To the extent that we can all read the sentence, do you have any -- do you believe



Page 84

that that sentence is defamatory?

A.   No.

Q.   Do you believe --

A.   Not -- not as a standalone sentence, but probably in the context of the -- of -- of his article. Like, somehow we weren't upholding our fiduciary duty, but, whatever.  Yeah, that sentence itself is not defamatory.

Q.   Okay.  What about it being false or misleading?

A.   The sentence itself isn't.  But I think in the context of the article, it probably is, but I can't -- I -- that -- so as a standalone it is not.

Q.   What part of this sentence do you consider to be false or misleading in the context of this entire article?

A.   I'd have to look at the whole article.  You know, and if you want to go sentence by sentence, that particular sentence on its own is not defamatory.

Q.   Well, we have been going sentence by sentence because, as we talked about at the beginning of this deposition, you've been driving --

A.   So that particular -- that particular -- yeah, that particular sentence is correct.

Q.   Okay.  Then there is a -- a case cite



Page 85

afterwards, it looks like it says, Capital gains, 375 US 180-1963.  I think you might -- may agree with me that that appears to just be a citation to some legal authority.  And it's not really about Lyons Wealth Management at all.

A.   I guess.

Q.   Okay.  It's -- the next sentence says, The duties articulated in capital gains (italicized) have been reaffirm.  Then there's the logo and then says most recent pronouncement regarding fiduciary standards.  Do you consider anything in that sentence to be defamatory?

A.   I don't know why, you know, it's being quoted in the context of this article, you know, but the sentence itself is not.  So I -- obviously, it's leading to some other, you know, thing that he said.

Q.   Okay.

A.   So we'll see what he says.

Q.   Okay.  And do you -- and, likewise, do you consider anything about that sentence to be false or misleading?

A.   Not as a standalone.

Q.   Okay.  The next sentence says, The fiduciary duty standard is broad and applies to the entire advisor-client relationship, with the word entire underlined.  Do you consider anything about that


MAGNA
LEGAL SERVICES

Page 86

statement to be defamatory?

A.   No.

Q.   Do you consider anything about that statement to be false or misleading?

A.   Not -- not as it stands alone.

Q.   Okay.

THE VIDEOGRAPHER:  Mr. Read, are you able to turn your video on?

THE WITNESS:  You know, I'm trying to -- I'm in the wrong spot.  I go to this -- I have to go to this other spot.  So I'm trying to find it while we talk.  But, anyway.  Keep -- hold on a second.  Is my video off?

THE VIDEOGRAPHER:  It is.

MR. ERSHOCK:  Yes.

THE WITNESS:  All right, hang on a second. Just wait a second.  Okay, hang on one second.  The reception here is absolutely horrible.

[Zoom distortion] Come back in five minutes. This is just [Zoom distortion] a year ago.

THE COURT REPORTER:  Mr. Read, if you're speaking to us, you're barely discernible.

THE VIDEOGRAPHER:  Counsel, he logged out. Would we like to go off the record?

MR. ERSHOCK:  Please.



Page 87

THE VIDEOGRAPHER:  Off the record, 12:36.

(A short break.)

THE VIDEOGRAPHER:  On the record, 12:41.

MR. ERSHOCK:  Okay, Mr. Read, you were attempting to start a conversation briefly off the record.  What -- what were you trying to say?

THE WITNESS:  Yeah, basically, if -- if it's possible, I'd like to -- if we could continue Monday afternoon because I, you know, I can't stay on much longer.  And obviously these -- these technical difficulties are taking -- taking us -- it's taking a lot longer than we -- you know, it's a nightmare.

MR. ERSHOCK:  All right.  You do realize that we were going to mediation on Monday afternoon?

THE WITNESS:  It's -- no -- no, I was not aware of that.

MR. ERSHOCK:  Okay.

THE WITNESS:  I thought this whole thing was getting postponed.  I -- I -- so -- no -- no -- no, no one told me about mediation on Monday.

MR. ERSHOCK:  Okay.  It's -- so you -- you have some kind of preexisting conflict right now?

THE WITNESS:  Yeah.  I mean, I -- I thought three hours would be long enough, but it doesn't


MAGNA
LEGAL SERVICES

Page 88

look like it is.  And then between the technical difficulties...  I definitely did not know we had a mediation Monday.  That's -- that's news to me.

MR. ERSHOCK:  All right.  Are you -- are you -- are you terminating the depo in deference to your preexisting conflict?

THE WITNESS:  No.  I'll leave it to my attorney because again, I -- we had communication issues ourselves the last couple of weeks, but I'm not -- I'll let you handle this, Shruti.

MS. KADAM:  My understanding was that this deposition was going to be continued anyways.  And I don't know if you want to have this conversation off record.

MR. ERSHOCK:  Well, I don't actually --

THE WITNESS:  Me?

MR. ERSHOCK:  -- I -- I -- the understanding was between our discussions that we would be going in this deposition as long as I could, with the -- because there has not been any discovery produced in response to our requests, which is part of the reason that we were conferring on an extension of time beforehand.  So I think independent -- I think conflating -- needing to continue the deposition, because there aren't -- I don't presently have any



Page 89

responsive documents to ask about, other than what I've gathered myself, and terminating deposition because of a preexisting conflict with Mr. Read, I think those are two entirely separate matters.

MS. KADAM: Okay. So what do you want to do?

MR. ERSHOCK: Well, I mean, I -- my preference is to finish the deposition. It sounds like that there -- I -- I certainly will not be able to finish it in the next 15 minutes, if that's what runs up against Mr. Read's conflict. So I guess -- I -- I put it to -- put it to you and the witness: Are -- are we terminating this deposition -- are you terminating this deposition?

MS. KADAM: Well, no, I mean, we can also go ahead and take a lunch break during his meeting.

THE WITNESS: No, no, I -- I -- I'm busy the rest of the day. I can't -- I can't take a lunch break. I, like I said, assumed this wasn't even happening. So anyway, I'm more than happy to get on the phone Monday morning, but I don't know -- what mediation? I -- I have no idea there's a mediation on Monday that's -- I've not heard those.

MS. KADAM: Let's just -- let's just go off the record. Give me a five-minute break.

MR. ERSHOCK: Okay.


MAGNA
LEGAL SERVICES

Page 90

THE VIDEOGRAPHER:  Off the record, 12:45.

(A short break.)

THE VIDEOGRAPHER:  On the record, 1:43.

MR. ERSHOCK:  All right.  I guess -- it's my understanding that the plaintiff is terminating the deposition for today.  And the deposition, I guess, will be continued at a -- at another point in time, but for the remainder of today it's being terminated.

THE COURT REPORTER:  The court reporter requesting clarification.  Is the deposition being continued, or completed, or suspended?

MS. KADAM:  Completed for today is my understanding and potentially continued.

THE COURT REPORTER:  Thank you.  The record will also reflect.  If there's nothing else?  All right.  Counsel -- not yet.  Counsel Ershock, do you wish to order the transcript?

MR. ERSHOCK:  Yes.  I need the transcript.  I guess prior to -- once -- once -- can we -- can we go back on for one second?  Sorry.

THE COURT REPORTER:  We're still on the record, sir.  We haven't left.

MR. ERSHOCK:  Oh, we are, okay.  I just want to state so that it's clear that we're -- we're not



Page 91

in agreement that -- that the deposition should be terminated today.  But we understand that the plaintiff himself, or the representative isn't available.  We -- we don't agree that it should be terminated because we were prepared to go forward, but that -- it is what it is.

THE COURT REPORTER:  The record will reflect.  You wish to order the transcript for delivery by?

MR. ERSHOCK:  Prior to -- let's say, on or before May 8th.

THE COURT REPORTER:  By 5-8.  Yes, sir.  Counsel, do you wish to order a copy?

MS. KADAM:  Not at this time, but I'll let you know.

THE COURT REPORTER:  No copy.  Thank you, Counsel.

MR. ERSHOCK:  I will -- I will email you the four exhibits, I believe.

THE COURT REPORTER:  Yes, sir.  That's what I was just going to ask.  Thank you very much.

MS. KADAM:  I will email those as soon as we're done with the -- with this discussion.

THE COURT REPORTER:  Thank you very much.  If there's nothing else?

MS. KADAM:  I was just going to say, Alex, can



MAGNA
LEGAL SERVICES

Page 92

you just cc me in that email as well when you send the exhibits over, thank you.

MR. ERSHOCK:  I can.

THE COURT REPORTER:  Mr. Calvarese, anything from you?

THE VIDEOGRAPHER:  No, sir.

MR. ERSHOCK:  All right, I guess that is it for today.  Thank you, Gentlemen.

MS. KADAM:  Thank you, everyone, for your time.

THE VIDEOGRAPHER:  Off the record. 1:46.

(The deposition was completed for the day and potentially continued.)

(After the deposition was terminated for the day, Exhibits 1 through 4 were marked for identification.)



Page 93

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF POLK

          I, Dave Shallbetter, Notary Public, State of Florida, certify that SANDER READ personally appeared before me via videoconference on the 1st day of May, 2026, and was duly sworn.

          Signed this 8th day of May, 2026.

_____
Dave Shallbetter
Notary Public, State of Florida
Commission #HH 703864
Expires:  November 26, 2029

Produced Identification:  X
Identification Produced:  Florida Driver's License



Page 94

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA

COUNTY OF POLK

      I, Dave Shallbetter, Court Reporter, do hereby certify that I was authorized to and did remotely report the videoconference deposition of SANDER READ; that a review of the transcript was requested; and that the foregoing transcript, pages 4 through 92, is a true and complete record of my notes.

      I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

      The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

      Dated this 8th day of May, 2026.


_____
Dave Shallbetter
Court Reporter



MAGNA
LEGAL SERVICES

Page 95

PLEASE ATTACH TO THE DEPOSITION OF:  SANDER READ

IN THE CASE OF:  LYONS V WOLPER ET AL.

MAY 1, 2026

                          ERRATA SHEET

INSTRUCTIONS:  Please read the original transcript of

your deposition and make note of errors or amendments in

the transcription on this page.  DO NOT MARK on the

original transcript itself.  Please sign and date this

sheet.

PAGE    LINE    ERROR OR AMENDMENT    REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read

the foregoing document and that the facts stated in it

are true.

Signature of Deponent:  _____

Date:  _____



May 8, 2026
Sander Read
c/o SHRUTI KADAM, ESQUIRE
WAUGH PLLC
skadam@waugh.legal

Re:  Lyons v Wolper et al.
Deposition of:  Sander Read

Dear Mr. Read:

          The referenced transcript has been completed and is being e-mailed to you for reading and signing purposes.

          Upon receipt, please print the Errata Sheet and make any and all corrections on the Errata Sheet. Please return the Errata Sheet via email to our office at production@magnals.com.

          If you do not read and sign the deposition within a reasonable time, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court.  If you wish to waive your signature, sign your name in the blank at the bottom of this letter and return this letter to us.

                    Very truly yours,
                    MAGNA LEGAL SERVICES
                    Seven Penn Center
                    1635 Market Street - 8th Floor
                    Philadelphia, PA 19103
                    866-624-6221

I do hereby waive my signature:


_____
Sander Read

cc via email:  Alex Ershock, Esquire



# Magna
## Key Contacts

Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



| **A** |
|---|

**abbreviated**
52:6
**ability**
11:9
**able**
7:7 11:7 13:12 27:22
42:3,3 86:7 89:8
**about**
4:24 7:15 8:20,25
11:17 13:19 14:1,7
14:9 15:3,8,11,16
22:22 26:6 28:8
29:5,11,18 30:3
31:22 32:1,16,23
33:4 39:24 40:11
42:1,5,22 47:2,10
48:14 49:3,4,4,6,16
59:6 64:5,16 65:8
65:19,22 66:1 71:2
71:22 72:9 73:20
78:13 81:5 82:12
84:9,21 85:4,19,25
86:3 87:21 89:1
**above**
70:22
**absolutely**
30:13 46:7 86:18
**accept**
14:16
**access**
43:13
**according**
28:11 54:15
**account**
18:10
**accounts**
31:2
**accrue**
21:2
**accurate**
55:4,20,21 68:5
**across**
7:6,6 83:18
**Act**

83:19
**action**
94:11,11
**actions**
45:6
**actual**
20:9 49:1
**actually**
5:11 6:15,19 8:12
27:19 28:19 33:23
35:2 44:14 50:16
55:9 58:18 60:15
69:1,6,6,16,22
76:21 78:17 80:1
81:25,25 88:15
**addition**
7:4 17:23 23:16
**additional**
18:1 19:3 74:8
**address**
11:2
**admit**
14:16
**ADV**
54:15
**advance**
47:13
**advantage**
16:9
**advice**
42:9
**advise**
35:4,11
**advised**
33:22
**Advisers**
83:19
**advisor**
11:24 12:3 33:21
35:4 52:6
**advisors**
83:20
**advisory**
63:12
**advisor-client**
85:24

**affect**
24:7
**affects**
22:23
**affiliates**
12:11
**affirm**
4:23
**after**
10:25 27:11 32:17
34:24 41:7,9,12,16
41:21 44:1,24 46:10
61:4 80:7 81:2
92:14
**afternoon**
8:13 87:9,15
**afterwards**
85:1
**again**
16:15 21:2,25 28:12
34:13 41:14,14
43:25 48:6 60:13
67:12,20 70:11 72:1
76:20 77:7,21 88:8
**against**
18:24 19:14 23:2
29:14 38:9,10,21
61:9,14,23 62:3,11
89:10
**agencies**
51:2
**ago**
6:1,8,16 7:15 14:20
47:10 86:20
**agree**
27:20 45:11,15,17,21
45:24 46:1,9 61:11
62:25 69:25 71:7
73:2 85:2 91:4
**agreed**
3:23 43:9 68:7 79:7
**agreeing**
45:13,25
**agreement**
3:12 27:11 35:20
40:6,21,24 41:10,17

43:1,22,24 44:5,16
44:21 45:10 46:4
49:4 91:1
**ahead**
26:13 43:20 62:9
79:25 82:10 89:15
**ahold**
11:1
**al**
95:2 96:6
**Alex**
2:6 4:15 53:23,24
56:23 91:25 96:25
**Alexander**
5:11 6:19
**Alex.Ershock@lew...**
2:9
**all**
4:11 5:14 7:13,23 8:9
10:1,7,24 12:19
13:17 26:10 28:7,11
28:18 30:3 34:9
37:16 46:9 48:9
49:1,17 52:8,17
57:24 58:3,18,18
60:5 63:3 70:6,7
74:5 77:3,4,15,19
77:20,24 78:15
79:12,16,19,23 80:2
80:3,4 81:10,16
82:20,21 83:24 85:5
86:16 87:14 88:4
90:4,16 92:7 96:11
**Allen**
12:11,21
**Allocation**
35:25
**allowed**
27:8 28:10
**allows**
23:6
**almost**
64:16 71:12
**alone**
86:5
**alpha**



17:15,19,19,21,23
17:24
**already**
33:14 34:11,12,21
39:17 46:6 69:2
96:14
**also**
2:12 10:22 22:17
25:6 35:21 42:3
43:7,16 52:15 55:9
55:19 56:23 58:4,22
67:23 70:12 71:4
81:5 89:14 90:16
**always**
55:18 56:12 67:24,25
67:25
**am**
20:13 22:13,13 27:21
94:9,10,11
**AMENDMENT**
95:8
**amendments**
95:5
**amount**
11:4 19:16 21:9 24:6
24:16 78:18
**amplified**
22:24
**an**
9:8 11:24,25 13:1
15:2 16:18 18:10
23:14 25:3 27:15
31:4 33:21 35:4
41:5 42:8 44:23,24
47:2 50:5,5,19,20
50:22 51:16,19,25
54:1 55:13 59:22
62:11,16,17 63:20
65:4,11 67:15 68:1
72:3,6,17,24 73:6
73:15,19 88:22
**analogy**
19:9 20:8
**Android**
22:11
**and/or**

94:13
**annual**
74:17
**another**
7:24 23:8 41:24 42:6
42:24 61:19 62:25
74:1 90:7
**answer**
7:22 8:1 10:7,10 11:9
30:20 32:19 46:19
46:20 47:23 49:11
49:13,15 51:16
52:10,18,20,22,25
54:9 59:3 72:21
76:25
**answered**
46:17 57:20
**any**
7:10 8:8 9:7,15,16,17
9:17 13:5 14:2 15:3
19:15 20:3 22:25
25:6 28:7,25 29:2
36:10 38:11,18 41:2
41:2,19 42:9,9 45:1
45:6 46:12,22 47:13
49:6 50:14 51:13
54:9 58:14,14 60:17
61:8 62:2 63:8,13
63:16 67:14,18 74:9
74:12,18,19 75:1,3
75:10,13,22,25 76:9
76:12,19 77:5 81:5
83:13,25 88:20,25
94:10,10,13,13
96:11
**anybody**
7:2 13:21 14:9,10
15:14,15 32:5
**anything**
9:18 14:1 27:2 32:1
46:10 63:25 64:3,7
64:8 65:19 85:11,19
85:25 86:3 92:4
**anyway**
76:24 86:12 89:19
**anyways**

88:12
**anywhere**
74:23
**appear**
79:23
**appearances**
2:1 4:12
**appeared**
93:7
**appears**
71:1 85:3
**applies**
85:23
**apply**
94:13
**appreciation**
21:9 74:18
**approaching**
10:1
**April**
32:25 33:1 34:10
41:9,12,15
**arbitration**
61:25 62:11,17,17
**arbitrations**
61:23
**are**
3:24 4:1,24 5:18 8:4
8:19,20 9:17 12:5,8
12:9,21,21 13:1,18
16:19,20 17:8,9,14
18:22 22:4,11,19,19
23:2 25:22 27:15,16
27:16 28:5 29:5,7
30:11 35:12,13,14
35:18 37:6 47:19
51:10 56:11,19 59:1
68:22 69:2,4 73:17
74:7,8,17 75:21
80:20 86:7 87:11
88:4,4,5 89:4,12,12
89:12 90:24 95:23
**aren't**
33:13 88:25
**argue**
79:14

**around**
31:13 42:2 43:1,10
43:12 47:3 82:20
**arrive**
66:17
**art**
29:1
**article**
3:10 10:24 26:15,24
27:3,12,16 28:16
29:3,20,23,25 30:15
30:19 31:15,23 32:2
32:6,11,22 33:4,6
33:24 34:3 39:17
41:3,20,23 42:20
43:5,14,14 44:7,17
45:2,7,23 46:6,8,12
46:22 49:2,6,8,18
51:12,25 52:4 53:12
54:1,5,7,11 56:24
63:18,25 65:9,12
78:11,15 79:2,6
80:7 81:2,14 82:2
83:4 84:5,12,16,17
85:13
**articles**
30:6
**articulated**
85:8
**as**
1:12 5:6,7 8:5 9:25
10:1 11:5,6 13:5,8
18:21 19:7,20,24,24
20:10,20,20 22:19
22:19,20 23:10,14
26:16,17,18,19
27:14 28:1,7,19,24
28:25 29:2,24 30:15
34:24,24 38:25
39:17,18,22 40:2,22
40:24 41:20 42:19
45:17 46:12,22 49:5
49:6 58:22 59:25
60:7 62:1,5,13,18
63:20,21 65:4 66:25
67:15,17 68:10 69:9


MAGNA
LEGAL SERVICES

76:16 77:8,21 78:9 78:18 79:23 84:4,13 84:21 85:21 86:5 88:19,19 91:21,21 92:1

**ask**
7:25 8:20 10:9 16:15 23:13 33:3 36:16 41:14,14 42:7 44:11 49:6 67:12 71:19 89:1 91:20

**asked**
8:25 11:14 28:3 32:15,15 36:22 46:17 74:25

**asking**
7:25 8:2,10 9:15,17 28:5 45:22 71:21 72:7,9,22 73:3,4,5

**asset**
15:20 23:21

**assets**
35:11 54:17 67:24

**assignment**
75:19,22

**associate**
4:18

**assume**
8:2,15

**assumed**
8:9 43:24 44:21,22 80:24 89:18

**assures**
75:7

**astonished**
31:24

**at**
4:7 8:11 9:25 10:16 14:2 17:1,1,1 20:24 23:19 25:21 28:2,22 30:11,12 31:2,4,19 31:24 32:2 41:1 42:25 43:15 45:22 49:2,14 53:10 56:19 58:18 66:22 69:1 70:1 73:22 74:4

75:19 81:12 84:17 84:21 85:5 90:7,7 91:13 96:12,15

**ATTACH**
95:1

**attached**
11:19 26:16 28:13 38:25 39:23 40:2

**attempt**
61:13

**attempted**
61:23,24 62:11,17

**attempting**
57:19 87:5

**attention**
28:17 29:4 30:20,23 31:7,16,17,20,23 32:2,6,11,22 41:3 41:21

**attorney**
9:16,19 41:24 42:6,7 42:8,20,24 48:25 52:23 88:8 94:10,11 96:14

**attorneys**
14:2 48:17,18

**attorney-client**
9:13

**audible**
51:15

**Austin**
12:10,20

**authored**
37:20

**authority**
85:4

**authorized**
94:6

**Auto**
22:12

**availability**
9:1

**available**
9:6 41:6 42:1,14 43:8 44:13,17 59:6 91:4

**Avi**

60:11,11,12 61:3,18 62:7,25 78:4,5,7,8 78:14,23 79:4 80:6 80:22,22,24 81:9,12 82:1,2

**aware**
9:17 47:19 87:17

**away**
17:12

**A-L-E-X-A**
5:12

**A-L-E-X-A-N-D-E...**
5:17

**a.m**
1:18 4:6

---

### B

**back**
19:19 20:18 28:20 36:16 45:16 47:4 49:1,6 57:19,22 60:19 61:6 67:1,7,8 67:13 86:19 90:21

**bad**
79:17

**badly**
56:6

**banners**
26:18

**barely**
86:22

**based**
9:3 17:25 18:20 24:19 26:21 54:16 59:8 79:3 81:11

**baseline**
23:23 24:1

**basically**
10:13 12:11 13:6,19 14:18 15:1 16:20 17:8,13 18:9 33:22 37:24 44:10 80:24 87:7

**basis**
20:3

**be**

4:24 7:5,6,7,10 11:6 11:6,14 12:24 16:25 18:1,23 22:8,23 23:6,14,16 24:14,19 25:2,3,11,14 26:7 28:8,9 33:25 34:16 35:8 36:15 42:3,4 47:4,14,16 49:9,15 49:21 50:20 52:7 53:9,11,16 54:4,5 54:18,20 55:2,15 56:17 57:20 60:2 63:21 66:9,13,13 67:17,18 69:8 70:12 72:13 74:10,13,20 75:1,4,10,14,23 76:1,10,13,19 77:6 83:16 84:15 85:3,11 85:19 86:1,4 87:25 88:12,18 89:8 90:7 91:1,4 96:14

**beach**
12:12

**because**
6:25 7:10 8:1,17,22 9:24 10:5 22:18 28:21 29:8 33:12 35:10 45:12 49:23 52:9 53:17,18 55:18 56:14 58:13 60:10 63:7,15 64:8 65:24 66:6 67:20 70:9 71:5 73:24 76:20 78:21 80:9 81:3,24 82:4,4 83:16 84:21 87:9 88:8,20,25 89:3 91:5

**Beeline**
22:6

**been**
7:19 9:22 11:2 12:2 31:10,11 33:24 41:16 43:5 44:7 46:6,13,23 47:1 50:19 65:22 68:5 84:20,22 85:9 88:20


MAGNA
LEGAL SERVICES

96:8,14
**before**
5:25 18:6 23:17
30:19 33:18 42:7
44:1,16,24 45:7
46:10 47:9 57:20
63:24 64:13 65:9
67:5 68:13 80:17
82:6 91:10 93:8
**beforehand**
65:9 88:23
**begin**
5:3
**beginning**
84:21
**begins**
4:2
**behalf**
1:13 9:8 43:21 44:6
45:18 46:4 48:19
63:16
**being**
4:7 5:6 24:15 28:1
40:6 49:5 50:22
63:15 84:9 85:12
90:8,11 96:9
**believe**
9:9,21 12:20 20:15
27:15 28:15 31:8
32:25 33:2 34:17
35:22 37:15 38:23
41:13 43:6,16 47:18
61:15 77:20 81:13
83:25 84:3 91:18
**believes**
52:14
**below**
45:17
**best**
11:9 34:16,20 48:9
49:7 61:21
**better**
22:8,16 69:9
**between**
3:23 13:18,19 15:6
16:10 20:8 27:19

28:5 35:23 40:6
44:3 45:3,8 88:1,18
**big**
26:13
**bigger**
78:6
**biggest**
78:16
**Bisgaard**
2:7 4:8,16
**bit**
25:20 44:3 47:10
51:24 83:16
**bizarre**
33:8
**blah**
7:22,22,22
**blank**
96:15
**blanket**
76:22
**blurb**
29:13
**board**
48:16
**borrow**
19:11,13,16,22 20:2
20:5 21:3,5,20,21
23:5,22 24:3,6,12
**borrowing**
16:10 17:18 18:24
23:2 24:16,18
**both**
4:16 71:11 73:10
83:20
**bottom**
9:21 96:15
**bought**
17:2,11,11
**box**
13:6
**breach**
13:17,18 27:11 43:18
**break**
44:2 47:6,9 57:16
66:19 87:2 89:15,18

89:24 90:2
**breaking**
66:4
**breakpoints**
24:9,11
**breaks**
83:19
**breakup**
66:22
**breakups**
66:7
**bridge**
66:8,9
**brief**
65:13
**briefly**
87:5
**bring**
61:8 62:11,17
**bringing**
32:6
**Brisbois**
2:7 4:8,16
**broad**
85:23
**broke**
56:5
**broker**
19:17 21:2 23:25
**brokers**
24:10 69:3 80:10
**broker's**
79:1
**broker/dealer**
24:10
**brought**
27:24 28:16 29:4
30:20,22 31:6,15,17
31:19,23 32:2,11,21
41:3,21 62:3,4,12
62:16
**Browman**
12:10
**Brown**
14:24
**brushed**

23:13
**buddies**
60:12 61:18
**Bunker**
61:20
**business**
36:8 39:12,13 54:24
55:12
**businessman**
9:25
**busy**
8:22 89:16
**butterfly**
16:25 17:9
**by**
1:12,19,22 3:23 5:6,8
6:18,24 9:14,19
12:9,21 13:1 17:23
18:20 19:4 20:17
27:4 28:21 30:14
32:11 33:11 38:9
40:10,22 42:18
46:18 47:8 49:13,17
50:1,4 51:4 52:21
53:8,12 54:11 55:22
57:21,22 58:1 59:12
62:4,12 63:19 67:1
67:8,10,15 71:23
72:2,20 75:20 76:17
77:8,22 78:25 83:3
83:19 84:18,20 91:8
91:11 94:13

---
**C**
---
**C**
39:1
**calendar**
17:3 31:7 32:7,10
36:17
**call**
18:17 35:16 58:9
59:15,15,16,20,20
59:23,23 75:9,18
78:7 82:3
**called**
13:6 16:2,13 19:14



23:5 30:7 33:15
37:7 49:18 58:22
**calls**
17:3,8 18:18 52:9,15
53:1
**Calvarese**
2:13 4:9 92:4
**came**
10:9,16 45:23,24
**cameras**
21:24
**can**
6:25,25 7:20 10:11
10:11 11:6 12:13,18
17:13 18:1 19:11,13
20:9,16 21:8,10,11
21:12 22:3,23 23:4
23:6,14,16 25:17,17
26:8 30:11 32:3,5
34:17 37:5,9,9
41:20 44:11,11
46:19 47:4 48:11
51:2,9,11,20,24
52:10,25 53:9,11,16
56:2,9 59:3,8 66:11
66:17 72:17,21
78:12 79:14,14,14
79:20,25 82:19,20
82:20 83:24 89:14
90:20,20 91:25 92:3
**cannot**
51:1
**can't**
18:14 20:5 27:19
34:19 45:24,25,25
49:13,13 60:23 73:2
82:4 84:12 87:9
89:17,17
**capable**
30:10
**capacity**
6:11,12
**capital**
85:1,8
**car**
22:15

**care**
83:21
**career**
13:11
**CarPlay**
22:12
**case**
1:2 5:21,22 13:20
15:8 25:21 26:7
27:13 41:15 53:11
84:25 95:2
**cases**
17:16 58:3,4 70:16
70:16
**cash**
3:13 17:5,16,22
18:10 24:23,23
68:12 69:5 70:12
71:6 72:8,12,13
74:2,17 76:6
**Catalyst**
32:14,18 33:17,19,21
34:5 35:4,8 36:10
41:8,15 47:10,11,20
48:13,15,19
**Catalyst-Lyons**
35:25
**categorize**
10:15
**cc**
92:1 96:25
**cease**
33:14 34:11 37:17,20
38:2
**Center**
96:18
**CEO**
48:15
**certain**
35:10
**certainly**
41:8 64:15 89:8
**CERTIFICATE**
3:4,5 93:1 94:1
**certification**
94:12

**certified**
5:7
**certify**
93:7 94:6,9
**certifying**
94:14
**chance**
8:21
**change**
47:3 82:25 95:8
**characterization**
29:22
**Charlie**
36:1,1
**chat**
64:9,22
**check**
62:6
**choice**
65:1
**Christian**
9:9 13:23 28:19
**Christian's**
14:2,10 15:16
**Circuit**
38:19,20
**citation**
85:3
**cite**
84:25
**cited**
34:2
**citing**
36:6
**claim**
27:25 62:3,17,18
80:12
**claimant**
82:3
**claiming**
27:3 78:15
**clarification**
90:11
**clarifying**
67:4
**clarity**

**clear**
67:11
5:14 8:17 26:16
38:24 67:7 73:4
81:9 90:25
**clearing**
75:20
**clearly**
7:22,22 44:12 55:8
78:10
**Clerk**
96:14
**click**
41:23
**clicked**
13:16 43:7
**client**
4:18 23:4,8,8,9,10
25:16,18 27:5 35:9
35:12,13,15,17,18
52:11 59:8,22 63:1
69:7 73:5,20 77:13
77:15 78:6,19 80:8
81:7,7,8
**clients**
25:23 27:19 60:6,14
60:18,21,25 62:15
68:25 69:2,2,11
71:9 75:7,20 76:4,5
78:11,15 79:16 80:4
81:6,11 82:21
**client's**
29:22 56:17
**close**
63:7,9 76:7,7
**CLTAX**
36:18
**clusters**
79:20
**Cohen**
60:11,11,12 62:7,25
78:4,5,7,8,23 79:4
80:6,13 81:5,9,12
81:18,20 82:15
**Cohen's**
80:22,22



collateral
63:22 67:17 75:8
colleagues
10:22
come
51:20 76:17 77:9,23
82:2,13 86:19
coming
10:14
Commission
93:15
communicating
48:13
communication
88:8
company
10:5,14
complaint
3:11 26:16,22 28:13
38:9,13,14,15,19
39:1,10,18,19,24,25
40:2 44:4 49:12
56:20
complete
94:8
completed
90:12,13 92:12 96:8
completely
34:16 55:17 78:20
80:16 81:15 82:22
complex
16:11,17,22,22,24
65:17
compliance
32:13,18,20,23 36:6
complied
47:20
comprises
68:23
concentrated
70:21
concepts
71:12
conclusion
39:8 52:10,16 53:2
conditions

20:9
conferring
88:22
confidential
40:25
confirm
8:20 46:1 60:23
64:12 78:12
conflating
88:24
conflict
87:23 88:6 89:3,10
connected
22:11,15 94:11
connection
32:17 33:4 56:17
57:20
connotation
50:13,14 51:8,9
conservative
25:11
consider
35:8,8 49:9,21 50:2
52:7 53:16 54:3,5
54:18,20 55:1 60:8
63:22 65:19 67:14
67:18 74:9,12,19
75:1,3,10,13,22,25
76:9,12,19 77:5
84:14 85:11,19,25
86:3
contact
48:12 60:21 61:3
contacted
60:10,18,25 61:1,2
contend
83:7,12
contending
26:25
content
9:15 14:1,18 27:16
contents
49:7
context
53:17 74:14 75:2,12
78:3 84:5,12,15

85:13
continue
19:22 24:17 62:8
63:10 66:11 83:2
87:8 88:24
continued
88:12 90:7,12,14
92:13
continues
69:22
contract
63:12
control
94:13
conversation
63:24 64:6,15 65:8,8
78:4,13 79:3 87:5
88:13
conversations
9:16
convinced
81:10
copy
26:15 32:14,19 91:12
91:15
copying
59:1,4
Corey
13:2 14:12,14 28:5
31:17,18 32:7,12
37:24 44:10,10
corner
39:5 69:16 70:4
corporate
1:12 7:14 11:11
corporation
6:12,13,17 75:20
correct
19:1 24:4,8 25:7,24
26:3 27:17 37:18
38:7 39:5,13 41:17
45:10,19 58:13 65:3
67:24 69:23 70:5
71:10 77:16 84:24
corrections
96:11

correctly
38:4
costs
24:24
could
5:9 19:22,22 23:22
24:2 25:18 26:17,17
26:18 28:8 31:10,11
34:16 35:16 52:18
57:18 66:10 68:4
70:11 87:8 88:19
couldn't
32:19 63:3 80:10
counsel
2:5,10 3:23 4:11 5:2
14:6 56:16 86:23
90:17,17 91:12,16
94:10,11
country
51:11 83:18
County
38:20 93:5 94:4
couple
10:12 14:19 60:15
61:19 78:22 88:9
course
54:12
court
1:1,22 3:11 4:10,20
4:22 5:2 20:12,13
27:24 30:8,9 38:9
38:14,15,19 39:18
39:19 40:8 44:4
49:3 57:12,18,21,23
66:5,21,24 67:2,6,9
86:21 90:10,10,15
90:22 91:7,11,15,19
91:23 92:4 94:6,21
96:14
courts
83:18
coverage
22:7
covered
17:2 75:18
crazy



33:6
**create**
19:3 68:15
**created**
19:4
**creeped**
8:23
**cropped**
10:24
**current**
39:25 68:25
**currently**
8:5 14:7
**customer**
63:21 67:16 78:9,16
**customers**
27:7 29:14 30:7
61:19 76:20 78:22
79:20 81:16
**cut**
5:15 10:10
**cuts**
83:21
**cutting**
48:6
**C-L**
36:1
**C-L-T**
36:4
**C-L-T-A-X**
36:5
**c/o**
96:2

--- D ---

**D**
3:1 12:15 40:3
**daily**
21:2
**damages**
27:25 34:1
**dance**
82:20
**date**
1:17 6:8 19:24 28:13
28:23 29:19,20

30:15 31:4 40:15
41:17 43:24 45:15
45:17 46:15 95:6,25
**Dated**
94:17
**dates**
8:18,21 9:1 10:8 11:5
28:19,19,22 34:14
45:12,25 46:8
**datewise**
46:10
**Dave**
1:22 4:10 93:7,14
94:6,20
**Dawn**
12:10,19
**day**
32:23 34:18 45:21,22
45:23 89:17 92:12
92:15 93:8,12 94:17
**days**
21:5,6
**deal**
9:24
**dealer**
19:18 23:25
**dealers**
21:2
**dealing**
33:9,11
**deals**
9:12
**Dear**
96:7
**decide**
63:14
**decided**
63:7,8,9
**decision**
62:24 63:11
**declare**
95:22
**declines**
75:9
**decrease**
25:17

**defamation**
25:23,23 27:25 39:11
52:12
**defamatory**
26:25 27:4,4,16 28:2
28:4 49:9,21 50:23
52:7,14 53:13,16,17
54:4,6,10,13,18
55:2,3,7,7,9 58:13
58:15,19 60:9,16
63:23 64:1,4,17
66:3 68:2,8 74:13
74:20 75:1,11,23
76:10,19,22 77:16
78:1,21,24 79:6
80:8 82:23 83:8
84:1,8,19 85:11
86:1
**DEFENDANT**
2:12
**defendants**
1:8,13 2:10 3:8 4:16
40:7
**deference**
88:5
**defined**
73:1
**definitely**
37:14 64:17 88:2
**DeGargelisa**
12:12
**delivery**
91:8
**deny**
14:16,16
**depending**
25:18
**depends**
19:23 25:16
**depo**
88:5
**deponent**
3:24 95:24
**depos**
7:19
**deposed**

7:19
**deposit**
72:13
**deposited**
74:1
**deposition**
1:11 3:24 4:2,6,17
5:25 6:3,7,10 7:15
7:16 8:6 9:1 11:19
13:15,22 14:3,7,11
15:4,12,16 28:20
56:19 65:5 84:22
88:12,19,24 89:2,7
89:12,13 90:6,6,11
91:1 92:12,14 94:7
95:1,5 96:6,13
**describe**
16:6 23:1 58:17 65:4
69:9 73:5,9,22
**described**
17:10 18:20 66:1
**describes**
69:16 72:5 73:14
**description**
3:9 58:11 65:13 66:2
**descriptions**
74:3
**descriptor**
22:25
**Designated**
1:12
**designed**
71:9 74:9 76:6
**desist**
33:14 34:11 37:17,20
38:2
**despite**
82:21
**destination**
66:11
**detail**
44:14
**detailed**
65:17
**dialogue**
13:18 27:6,18,20,22


MAGNA
LEGAL SERVICES

Page 8

**did**
8:15 12:15 13:14,21
    14:1,10,15,24 28:1
    31:22 32:23 33:3,3
    33:11 34:4,4 36:10
    37:19,24 43:4 44:6
    46:11,21 47:12,16
    47:16,23 48:2,7,10
    48:18 51:4 54:13,14
    56:22 58:16 60:17
    60:21 61:8,13 62:10
    63:14 65:6 68:15
    71:14 76:17 77:9,22
    82:2,13 88:2 94:6
**didn't**
13:8 39:17 45:23
    46:7 48:1 49:11,11
    51:22 54:9 55:8,18
    56:1 58:16 61:11,11
    63:1,10,17 64:3,8
    65:3 78:4,10 79:1
    80:6,9 81:1
**difference**
20:7 70:13 72:10
**differences**
16:9
**different**
7:10 13:7,11 15:21
    23:4,9,11,11 34:17
    59:6,17 71:5,13,13
    74:2
**differently**
44:3
**difficulties**
87:11 88:2
**direct**
94:13
**direction**
16:21 22:24 94:13
**directions**
16:22 71:21
**directly**
34:2 36:7
**directors**
48:16
**disagree**

38:11,18
**discernible**
86:22
**disclosure**
70:19 73:13 74:14
    75:2,12
**discovery**
10:18,23 28:6,9
    88:20
**discussed**
14:16 32:4 78:6
    80:11
**discussion**
91:22
**discussions**
42:1,4 88:18
**disparagement**
39:12
**display**
41:25 42:22
**displayed**
42:7,21
**distortion**
5:12 16:21 22:9,13
    22:14,15,16 31:2,4
    31:14 32:15 36:25
    37:2 48:1,5 49:10
    54:7 55:25 56:3,4
    56:12,13,15 57:24
    62:22 65:6,7,25
    66:3,7 86:19,20
**distributed**
76:4
**DISTRICT**
1:1,1
**dive**
25:20
**dividend**
69:5 76:6
**dividends**
17:17 70:22 74:9,16
**divorce**
7:18
**doc**
40:13
**document**

3:13 26:7 28:12,14
    29:12 30:16 39:22
    39:23 45:22 48:11
    68:10,13,16,19 69:9
    95:22
**documented**
78:3
**documents**
36:17 80:12 89:1
**does**
15:18,21 16:14 18:7
    20:25 29:19,19,19
    30:4 33:19 40:5
    49:8,23 50:11 51:9
    51:12 55:23 59:18
    73:18 74:23 77:3,18
    79:11,23 82:14,16
    94:13
**doesn't**
20:4 53:6 59:21
    62:22 70:5 87:25
**doing**
7:5,11 55:9
**done**
6:10 7:19 14:19
    91:22
**don't**
7:24 9:18,19 10:19
    11:15 13:25 18:14
    20:3 26:13 27:9,21
    28:8,21,21,22 29:17
    30:1,18 34:23 36:21
    37:3 41:4,24,25
    42:17,22 44:19
    45:12,14,15,24 46:8
    46:9,24 48:22 49:12
    50:18,19,22,22 51:7
    53:25 54:2 56:12
    59:11,23 60:24 61:1
    61:1,4 63:4,4 64:1,2
    64:8,9,14,14,20,23
    65:14 66:23 72:9,22
    73:2,3,16 74:3
    80:23 85:12 88:13
    88:15,25 89:20 91:4
**double**

62:6
**double-edged**
21:11
**down**
8:13,14 12:12 13:9
    20:24 21:17,21
    30:10 32:18 33:12
    35:1,24 43:8,17
    44:2,21,22 45:3,24
    46:9 79:7 81:3 82:2
**Driver's**
93:19
**driving**
22:14 84:22
**dropped**
21:24 32:17
**dub**
63:25 64:1,3,6,8,10
    64:14,14,16,20,23
    64:23 68:6,7
**dubbed**
63:19 64:11 67:15,22
    72:2
**duly**
5:6 93:8
**during**
8:5 44:23 89:15
**duties**
85:8
**duty**
83:19,20,21 84:6
    85:23
**D-E**
12:14
**D-E-D**
12:15
**D-E-L-A-G-E-Z**
12:15

_____
            **E**
_____
**E**
1:7 2:12 3:1 4:5 39:5
**each**
7:7 16:21
**earlier**
22:19 35:23 65:5



**early**
29:16
**earn**
70:21
**earns**
24:23
**East**
2:3
**Eastern**
4:6
**educate**
71:9
**education**
69:12 73:6,20
**educational**
69:9 71:2
**effective**
41:16
**efforts**
9:7,18 44:15 45:2
**either**
16:9 17:10 21:12
29:15,16
**else**
7:2 14:9,10 15:14
27:2,21 32:1,5
61:20 90:16 91:24
**else's**
59:1
**email**
59:22 91:17,21 92:1
96:11,25
**employed**
5:19 6:18 12:5,9,21
**employee**
94:10,10
**employees**
12:8
**encompass**
82:15
**end**
19:24 25:7 48:14
**ended**
48:3
**ending**
47:11,14

**enhance**
58:24
**enhanced**
3:13 16:3,6,16 25:10
25:13 36:11 49:20
50:17 51:14 55:1,14
55:23 58:21,22 59:2
59:14,16 60:1 62:5
62:13,19 63:19 65:4
65:10,23 67:14
68:11,24 69:13 70:4
71:2,9,11,15 72:2,5
72:17,23 73:7,14,18
73:21 75:21
**enough**
7:12 87:25
**ensure**
75:8
**entire**
44:23,25 53:12 65:15
78:15 79:6 84:15
85:23,24
**entirely**
89:4
**entitled**
68:10
**entity**
12:2 51:13,21
**equity**
19:9,12,21 20:8
70:20
**Errata**
3:6 95:4 96:10,11,11
**error**
43:15,16 95:8
**errors**
95:5
**Ershock**
2:6 4:15,15 5:8 6:24
9:14 20:15,17 30:13
30:14 46:16,18 47:1
47:8 50:1 52:11,21
53:8,23 55:22 56:16
56:25 57:2,5,8,10
57:14,18 58:1 59:12
66:10,15,21 67:3,10

71:23 72:20 82:24
83:2,3 86:15,25
87:4,14,18,22 88:4
88:15,17 89:6,25
90:4,17,19,24 91:9
91:17 92:3,7 96:25
**especially**
78:23
**Esquire**
2:2,6,7 96:2,25
**essentially**
19:8
**estimate**
6:2 30:22 34:15
**estimation**
30:25
**et**
95:2 96:6
**even**
9:22 22:14 23:6,22
27:21 33:18 43:19
58:13 63:4 73:3
78:4,10 79:1 80:9
81:14 89:18
**eventually**
19:19
**ever**
5:24 7:15 20:1,2 66:3
68:12
**every**
23:4,9,10 59:18 62:2
62:10 77:13 81:7,8
**everybody**
40:10,22 77:18
**everyone**
64:12 79:11 92:9
**everything**
10:8
**evidently**
9:5
**exacerbates**
21:23
**exact**
31:4 34:14,18 44:9
45:12 46:8
**exactly**

18:3,3 37:6,11 41:4
61:24 71:12 78:13
79:13,16 81:17
**example**
19:20 23:15,17 24:18
**exceed**
25:5,6
**Except**
15:10
**excuse**
20:12 23:19 30:8
36:18 38:25 45:8
66:5 81:19
**executed**
40:10,22 42:25 44:5
45:9
**Exhibit**
26:22 28:12 38:25
39:1,17,18 40:3,25
45:17 68:10
**exhibits**
3:8 91:18 92:2,15
**exist**
20:4
**existed**
43:20 45:7
**existing**
70:23
**expected**
74:17
**expensive**
17:18
**experienced**
60:7
**Expires**
93:16
**exposed**
75:21
**extend**
20:10
**extension**
8:11 9:8 88:22
**extent**
9:12 11:18 35:10
52:17 53:1 83:24
**eye**


MAGNA
LEGAL SERVICES

41:5 44:23,24
**e-mailed**
96:9

**F**

**fact**
9:19 37:9 39:1 42:2
80:5
**facts**
25:21 95:22
**failed**
61:15
**fair**
7:12 24:25
**fake**
31:24
**fall**
29:9,15 30:18 31:12
**false**
31:25 54:21 56:3
64:5,8 65:20 67:18
74:10 75:4,14 76:1
76:13 77:6,12 78:20
79:6 82:23 83:12
84:9,15 85:19 86:4
**familiar**
13:1
**fast**
10:9
**federal**
27:24
**feed**
22:18
**few**
14:20
**fiduciary**
83:5,10,18 84:6
85:10,22
**filed**
28:2 38:10,15,19
39:5,8 44:4 96:14
**files**
13:16,20
**finally**
10:25 33:16
**finances**

51:6
**financial**
50:21
**financially**
94:11
**find**
53:15,16 67:23 68:1
68:8 82:11 86:11
**fine**
40:14 57:6,7
**finish**
19:2 29:21 89:7,9
**finished**
76:25
**firm**
1:6 4:4 9:9 13:3,8
14:2,10 15:6,16
34:22 37:18 38:10
38:21 39:11 40:7
48:22,24 49:19,24
49:24 50:8,11,15,22
51:24 52:3,5 53:4,5
60:6,22,25 61:8,23
62:4,12,18
**firms**
51:1 59:10
**first**
5:6 8:9 13:17 19:2
27:11 28:16,25 29:3
29:5,8,21 31:6,15
31:23 32:10 52:4
54:3 79:10
**five**
12:7,19,21 21:5,6
24:16 37:1 47:4
61:22 66:14,15
86:19
**five-minute**
89:24
**floating**
42:2
**Floor**
96:19
**Florida**
1:1 2:3,8 38:21 54:17
93:4,7,15,19 94:3

**flow**
3:14 68:12 69:5
74:18
**follow**
69:4
**following**
41:1
**follows**
5:7 66:25
**forced**
75:19
**foregoing**
94:8,12 95:22
**forever**
20:20
**form**
9:11 46:1,14 49:22
52:8 54:15 55:16
59:3 72:19
**format**
53:13
**formed**
51:18,19
**former**
60:20
**formula**
58:6
**Fort**
2:8
**forward**
91:5
**forwarded**
96:14
**found**
44:14 61:2 83:20
**four**
23:9 37:1 91:18
**frame**
29:10 45:11
**Fred**
32:21
**free**
20:6 51:11
**Friday**
1:17 51:7
**from**

4:13 7:7 15:16 19:10
20:5,8 28:6 34:25
43:5 46:23 48:13
51:20 52:2 55:11
60:4,6 66:12 70:13
70:23 78:17 81:5
92:5
**froze**
22:1
**frozen**
20:14,15 57:11
**fruition**
76:17 77:9,23 82:13
**full**
33:13
**fully**
43:17
**fund**
23:10 33:22 35:6,7
35:21,22,25 36:3,20
**funds**
32:14,18 33:17,19,21
34:5 35:4,5,8 36:10
41:8
**further**
75:17 94:9

**G**

**gains**
19:3 85:1,8
**gathered**
89:2
**general**
15:8 24:12 25:9
30:21 59:25 73:10
79:18
**generalization**
65:16 82:18,19
**generally**
16:6 47:3
**generate**
16:11 17:15,19 74:9
74:17
**generated**
18:1 70:23
**generates**


MAGNA
LEGAL SERVICES

17:22
**Gentlemen**
30:8 92:8
**get**
6:8 8:13 9:20 10:2,2
    10:25 11:3 12:16
    22:10 26:18 27:8
    28:20,23 29:14 30:7
    32:9 33:18 34:14
    42:17,23 44:9,14
    45:14 49:11 54:9,13
    56:1 57:13 63:17
    66:11 89:19
**gets**
17:3 64:23
**getting**
74:4 87:20
**gist**
55:10
**give**
4:24 10:8 48:11 78:2
    89:24
**giving**
11:11
**Glass**
32:21
**go**
7:12 13:9 20:19
    26:13 37:10 49:17
    57:12 61:10 62:9
    66:2,15 67:7 69:15
    77:13 79:25 82:10
    84:18 86:10,10,24
    89:14,23 90:21 91:5
**goal**
18:3 58:23 74:21
**goals**
13:11
**goes**
20:20 21:17,19,20
**going**
8:1,10,16,20 9:11,21
    10:21 18:11,15,15
    23:15 25:4,6 26:13
    33:5,25 34:15 36:16
    39:16,18,22 45:11

45:13 47:1 48:21
    52:8,12,17,19,22
    56:17 62:24 66:8
    67:12 70:17 78:25
    82:11 83:15 84:20
    87:15 88:12,18
    91:20,25
**gone**
43:13,25
**gonna**
29:9
**good**
4:15 5:9 49:2,5 57:2
    57:9
**Google**
17:13 42:4
**got**
7:17,22 9:3 11:1
    18:21 21:4,5 32:17
    34:24 53:20 64:2
    82:7,8
**gotta**
71:19
**government**
51:2,13,20
**group**
63:5 78:17
**guarantee**
74:22
**guaranteed**
74:23
**guess**
7:20 17:24 18:19,23
    21:15 28:9 29:8
    31:1 34:16 35:15,17
    38:23 39:15 40:3,12
    43:25 48:21 49:5
    51:11,23 52:23
    63:10 67:11 68:6
    73:9 79:3 85:6
    89:10 90:4,6,20
    92:7
**guessing**
24:5
**guy**
32:20 44:11 60:10

78:18 81:13
**guys**
8:19 20:16 28:5

———————————

**H**

**had**
5:24 7:16 8:21,21
    9:16 13:11 32:13,14
    33:14,17,23 34:11
    34:11,18,21,23 38:1
    41:15,24 42:6,8,14
    42:20,25 43:5,8,12
    43:16 44:7 46:6,13
    46:23 55:8 57:20
    59:17 63:24 64:6,9
    64:15,22 65:7,8,25
    78:5,7,8,11,13,14
    78:14,16,18,23 79:2
    79:4,5 80:5,6,23
    81:9,10,16 82:1
    88:2,8
**hadn't**
8:21
**hand**
4:23 69:16 70:3
**handle**
88:10
**hang**
71:19 86:16,17
**happen**
8:10,16 9:22 18:2
    20:25 61:12
**happened**
41:9
**happening**
8:12 10:6 89:19
**happens**
60:2
**happy**
49:15 89:19
**hard**
10:25 35:14 66:6
    69:4
**has**
9:22 12:1 19:25
    23:10 28:19 33:24

41:24 45:1 58:8,14
    60:3,6 69:17 73:25
    81:8 88:20 96:8,13
**haven't**
7:19 27:18 90:23
**having**
18:2 33:12,16 66:5
**he**
10:25 13:3,3,6,11
    20:15 29:13 31:18
    31:19,22,23 32:1,2
    50:5,5,18 52:18
    60:14 61:1,10 63:1
    63:2,2,2,4,25 64:2
    64:20,21,23 65:9
    68:4,5 78:4,5,7,7,10
    78:13,14 79:1,4,4,5
    79:7 80:4,5,9,9,15
    80:15,16,16,17,24
    80:25 81:1,2,3,3,10
    81:14,14,22,25 82:5
    82:6 85:15,17 86:23
**head**
48:23
**headset**
22:16
**hear**
20:16 22:3 32:19
    48:2 56:9
**heard**
20:19 51:15 56:6
    60:6 80:3 89:22
**hearing**
66:6
**heart**
28:21 42:18 49:13
    56:20
**hedge**
23:7 75:7
**hedged**
23:23
**Hello**
6:4
**here**
8:14 14:4 22:10 24:5
    27:14 28:24 29:2



41:20 42:19 53:15
53:20 56:17,20 62:1
65:1 72:10 74:4
86:18
**hereby**
3:23,24 94:6 96:21
**hereinafter**
5:7
**Hey**
10:21
**he's**
50:7,19,20 52:12
57:10 80:15
**HH**
93:15
**high**
17:17
**high-yielding**
16:10
**him**
11:1 15:8,11 44:12
61:2 64:3,7,22 66:2
68:7 80:25
**himself**
65:6 68:5 91:3
**Hine**
48:24
**hire**
35:10
**hired**
35:16
**his**
9:9 12:20 27:6,7
29:14 34:22 37:18
38:21 39:11 44:20
60:12 61:18 71:20
78:16,22 80:8 81:10
81:16 84:5 89:15
**hold**
10:25 23:15 59:25
86:12
**holders**
70:20
**holdings**
70:21,23
**Holy**

56:7
**home**
19:21
**hoping**
29:13
**horrible**
86:18
**hour**
15:2 47:2
**hours**
87:25
**house**
19:10,10 20:5,8 21:3
**housekeep**
39:16
**how**
12:1,5 14:24 16:5
21:14,14 22:22,23
22:25,25 23:1 26:13
31:15,24,24 44:12
44:14 61:3 64:10
65:25 69:3,7 79:13
**How's**
57:8
**hypothetically**
25:19

---
**I**
---

**idea**
17:15 27:6 31:1 55:8
62:2 63:8 89:21
**identification**
92:16 93:18,19
**identify**
52:13 53:19
**if**
7:5,18,24 8:1 9:7
17:21 19:12,20 21:3
21:3,5,19 22:17
23:7,17,18,18,23
24:15 27:21,21 28:6
28:9,22 34:13 36:22
36:25 37:10 38:4,8
39:17 41:8,11,15
43:4 44:13 45:20,21
49:14 50:16 51:5,5

52:1,2,23 53:3,3,12
53:24 55:6,10 58:16
59:5,22 62:20,20,23
62:23 63:11 64:20
65:3 66:2 70:10
72:7,12,13 73:5,17
73:17 75:8 77:14
79:18,18 80:14 82:4
82:17 84:18 86:21
87:7,7,8 88:13 89:9
90:16 91:23 96:13
96:14
**images**
26:18
**immediately**
20:25 21:1,1
**implies**
50:3,3,7 51:23
**inaccuracies**
58:14
**inaccurate**
58:12 78:1,1,21,24
**included**
68:19
**including**
12:6,24 73:13 79:19
**inclusive**
80:2,3
**income**
16:11 63:20 65:4,11
67:16 70:19,22 71:8
71:14 72:3,6,11,17
72:24 73:6,15,19,22
**incorrect**
55:6,6 56:13 58:8
60:14,16 68:1 80:8
80:17 81:3 82:23
**increase**
21:9 25:17
**increased**
19:8
**incredibly**
69:4
**indefinitely**
20:10
**independent**

29:3 88:23
**Independently**
45:6
**indexes**
37:2
**individual**
13:1 62:3
**individuals**
12:19
**information**
42:24
**initiate**
61:13
**input**
38:1
**inquiry**
11:18
**inside**
17:11,12,14
**instance**
16:24
**instead**
69:8
**INSTRUCTIONS**
95:5
**instruments**
16:20
**intended**
70:20
**intending**
27:25
**intent**
29:23
**interactive**
24:9 69:3 79:1 80:10
**interest**
16:9 19:15,17,20
20:3,23 21:4,6 24:7
24:19,24,24 25:7
70:22
**interested**
94:11
**interference**
39:12
**interfering**
22:18



**internet**
27:11 42:2 44:8
**interpreted**
83:18
**interrupt**
6:21
**into**
29:14,23 38:1 50:16
**investigate**
49:24 50:11 51:1,2
51:24
**investigated**
80:5
**investigates**
49:19
**investigating**
50:8,12,16 51:6,7,10
51:13 52:1,5 53:5
53:24
**investigation**
50:4,20 51:20,23
**investigator**
50:5,6,19,23
**investing**
15:24
**investment**
6:20 11:24 12:3 13:8
15:18 25:3,5 52:5
60:7 63:12
**investor**
16:23 25:11,15,19
**investors**
76:18 77:10,23 82:14
**involve**
55:23
**involves**
54:24 55:12
**IRS**
52:2
**isn't**
9:6 58:18 70:9 77:16
84:11 91:3
**Israel**
78:17
**issue**
56:18 64:25

**issues**
10:24 36:7 57:20
88:9
**italicized**
85:8
**items**
27:14
**iteration**
59:18
**its**
49:7 53:13 54:15,24
55:12 84:19
**itself**
27:17 59:9 61:23
84:7,11 85:14 95:6
**I'd**
6:8 7:5,7 27:7 36:21
84:17 87:8
**I'll**
11:9,9 12:14,16 26:8
26:21 28:20 32:8
34:13,14 39:15
40:24 41:13,14,14
41:14 42:17,23 44:9
44:14 62:6 66:8,13
66:13 67:11 77:21
80:14 88:7,10 91:13
**I'm**
7:18,25 8:1,2,14 9:4
9:11,15,17,20 10:5
10:21 11:5 12:14
20:19 22:1,1,6,13
22:15 23:1,15 24:5
26:14 27:8 29:9,9
29:12,22 30:2,2,9
30:16 34:15 36:13
36:20 38:4 39:16,17
39:22 45:11,12,12
45:13,15,25 48:21
50:12 51:5,6 52:2,8
52:17,19 53:1,11
59:4 62:8,24 65:3
66:5,8 67:12 70:1
76:25 82:7 86:9,9
86:11 88:9 89:16,19
**I've**

6:10 7:17,19 11:2
53:4 67:22 68:7
79:25 80:3 82:7
89:2,22

_____
**J**
_____

**Jack**
12:10
**January**
34:6,7 36:6
**jargon**
70:13
**Jennifer**
2:7 4:19
**Jennifer.Leto@lew...**
2:9
**Jerry**
48:15
**JoAnn**
48:25
**JOE**
2:13
**joining**
29:24
**Joseph**
4:9
**judge**
9:5
**Judicial**
38:20
**just**
5:14,14 7:18,23,23
9:20 16:17 17:10,25
18:1,6,20 19:20
21:2,3 22:9 23:14
24:17 28:3,8 29:9
31:24 34:18 35:3,3
38:24,24 39:15
41:14 44:8,15 47:1
47:9 48:21 50:8
52:16 54:4,14 55:19
58:16 61:16 66:10
67:11,13 69:11 70:2
77:19,20,20 81:24
82:7,15 85:3 86:17
86:20 89:23,23

90:24 91:20,25 92:1

_____
**K**
_____

**Kadam**
2:2 4:13,13 9:11
46:14,17 49:22 52:8
52:15,25 55:16
56:23 57:1,4,6,9
59:3 72:19 88:11
89:5,14,23 90:13
91:13,21,25 92:9
96:2
**keep**
6:23 70:17 82:11
86:12
**keeping**
41:5 44:23
**kept**
44:24
**kind**
8:23 10:18 15:18
18:21 22:25 26:14
49:2 53:14 56:19
80:20 87:23
**knew**
10:14 81:3
**know**
7:4,6,17,21,21 8:11
8:18 9:3,7,9,20,24
10:4,9,15,15,23
11:1,15 13:16,19,25
14:15,17 16:19 19:9
26:13 27:9,21 28:6
28:7,9,21 30:23
31:5,13 32:8 33:13
37:3,5 41:4,4,25
42:17,20,22 44:20
45:24 46:24 47:2
48:22 49:12 50:5,18
52:1 53:3,6,25 58:5
59:11 60:17,24 61:1
61:4 64:2,9,20,23
65:13 67:21 72:9,22
73:1,3,16 74:3 78:4
78:10 80:2,5 84:18
85:12,12,13,15 86:9



87:9,12 88:2,13
89:20 91:14
**knowing**
43:19 46:5
**knowledge**
27:9 45:2 46:12,22
50:15
**knows**
64:21

**L**

**L**
3:22
**language**
50:23 53:7
**large**
10:3,17 11:4 17:4
70:20 72:14
**largest**
11:18
**Larry**
36:1
**last**
6:3 8:11 10:12 11:3
12:13 13:23 66:25
88:9
**late**
29:16
**Lauderdale**
2:8
**law**
1:6 4:4 38:10 40:7
42:12 48:24 49:19
49:24 50:7,11,15,22
51:1,23 52:3,5 53:4
53:5 60:6,22,25
61:8 62:4,12,18
**lawsuit**
27:24 29:14,24 34:1
40:8 49:3
**lawyer**
50:20 79:14
**layman**
16:23
**leader**
78:17

**leading**
85:14
**least**
25:22
**leave**
88:7
**left**
13:3 15:6 39:4 70:3
80:15 90:23
**legal**
1:23 4:9,10 42:9 52:9
52:16 53:2 85:3
96:18
**less**
17:18 24:12,13 68:21
**let**
19:2 25:20 27:23
29:21,21 39:15 44:2
44:2 57:8 60:18
61:6 88:10 91:13
**Leto**
2:7 4:19
**letter**
3:7 34:11 37:17,21
38:2,6 48:18 96:15
96:15
**let's**
15:7 17:4,21 18:9,13
19:10 21:16 24:16
24:17 27:23 39:11
66:15 89:23,23 91:9
**leverage**
23:6,11 25:17 58:22
58:25 59:15,21
**leveraged**
16:8,8 58:23 60:2
**Lewis**
2:7 4:7,16
**liable**
63:12
**License**
93:19
**like**
6:7,15,16 7:8 8:12
9:4,25 10:6,9,11,21
11:3 13:7 14:18

17:5,25 19:9,21
20:5,25 21:3,3,7,8
22:11 23:22 24:12
25:16 28:3 33:5,6,6
33:8 40:5 42:10,12
43:10 44:13 45:20
45:22 47:13 50:11
50:12,12,18,20
51:25 56:16 57:10
57:12 59:11 64:2,9
64:21 65:7,15,24
66:14 67:3 69:5
70:10,10 71:16
79:14 80:4,14 82:21
84:6 85:1 86:24
87:8 88:1 89:7,18
**likes**
47:3
**likewise**
85:18
**limited**
17:8
**line**
16:20 95:8
**lingo**
73:9
**link**
43:14
**liquidity**
19:8
**list**
32:9
**listed**
49:12
**listen**
10:21
**litigation**
61:8,14
**little**
25:20 44:3 47:10
57:4 71:5 83:16
**live**
63:2
**LLC**
1:3,12 4:4,14 11:25
52:6 54:16

**LLP**
2:7 4:8
**loan**
19:21 63:22 67:17
74:7
**logged**
86:23
**logo**
85:9
**long**
6:1 12:1 14:24 16:12
17:11,16 19:24
20:10,20 30:19
87:25 88:19
**longer**
34:1 82:3 87:10,12
**look**
12:15,18 26:8,13
31:1 34:13 36:21
37:5 40:5 69:1
84:17 88:1
**looked**
45:22
**looking**
50:16 70:1 81:12
**looks**
57:10 85:1
**lose**
21:12,14 62:20 63:1
**losing**
62:21,23
**losses**
60:7 63:13
**lost**
21:17,21 36:8,8,8
60:12 62:18,22 63:4
63:6,6 76:18 77:10
77:15,23 78:5,8,16
79:4,11,12,17 80:5
80:25 81:6,10,16
82:14,21
**lot**
8:18 11:1 65:14 79:8
87:12
**love**
27:7



MAGNA
LEGAL SERVICES

**low**
24:12 75:10
**lower**
69:15,20 70:3
**loyal**
83:21
**loyalty**
83:21
**lunch**
89:15,17
**Lyons**
1:3,12 3:13 4:3,14
5:20 11:22 12:1,6,9
12:22 15:19,21 26:1
27:3 31:19 32:6
36:8,11 38:9,18
39:10 40:6 43:21
44:6 45:9,18 46:4
46:11,21 47:12 48:4
48:8 49:8,19 50:17
50:25 51:13,14,19
52:6 53:24 54:16,25
55:14,23 58:20 59:2
59:13,19,21,23 60:1
60:3,6,21 61:9,14
61:22 62:3,11,13,16
62:19 63:19,20
65:10,23 67:14,15
68:11,15,24 69:12
69:17 70:4,19 71:2
71:8,9 72:2,2,16,23
73:13,18,21,22 75:6
75:16 76:4,17 77:9
77:22 81:20 83:4,10
85:4 95:2 96:6
**Lyon's**
49:20

---

**M**

**ma**
23:18
**made**
8:17 9:8 27:4 60:12
60:15 61:4 62:4,7,7
62:25 63:15 68:5
76:17,21,23 77:2,3

77:8,15,18,22 78:8
78:11,14,18,23 79:2
79:5,16 80:6,9,13
81:1,6,13 82:1,5,6
**Magna**
1:23 4:9,10 96:18
**main**
20:7 60:10
**make**
7:23 17:22 18:6
21:10,12,19,22 24:6
26:9 62:12 67:7
95:5 96:11
**makes**
52:2 55:9 58:12
63:12 64:19 79:5
82:21
**making**
63:16 80:13
**man**
36:20
**manage**
35:17,20
**managed**
70:15
**management**
1:3,12 4:4,14 6:20
11:23 12:1,6,9,22
13:8 15:19,20 26:2
32:7 38:9,19 40:7
45:9,18 46:5,12,22
47:12 49:20 51:1,14
52:6 54:16 60:7,21
61:9,14,22 62:4,12
62:16 63:20 67:15
68:15 72:3 73:22
75:7,17 76:5,17
77:9,22 81:21 83:5
83:10 85:5
**Management's**
51:19
**manages**
54:17
**mannerisms**
7:8
**many**

12:5 22:25 23:1,1
42:4
**March**
38:11,21 39:8 40:11
40:16,22 41:1,11,21
43:1,10,12,20 44:4
44:6 45:3,4,8,8,19
46:11,21
**marg**
23:19
**margin**
18:11,16,23 19:7,12
19:14,24 20:2,6,9,9
20:20,23 21:8,15
22:22 23:5,14,18,20
23:24 24:1,19,24
25:4,6 58:24 63:22
67:17,25 75:9
**mark**
12:11,20 28:23 34:14
39:15,16,18,22
40:24 61:19 68:10
95:6
**marked**
45:16 92:15
**market**
8:23 59:8 68:22
96:19
**marketing**
60:4 68:4,9,23 69:1,6
69:8 76:3 81:11
82:22
**marking**
29:18,22 30:2
**material**
82:22
**materials**
68:4,9,24 69:10 71:2
71:8,14 73:6,20
74:15 76:4
**matter**
4:3 11:20 70:5
**matters**
89:4
**Matthew**
1:7 2:12 4:5,18

**may**
1:17 4:5 5:3 9:2
11:14 36:15 85:2
91:10 93:8,12 94:17
95:3 96:1,14
**maybe**
10:11 11:6 29:9,10
34:10 56:8,8 81:13
**me**
4:17 5:6 6:5 7:25
8:24 9:15,18 14:4
19:2 20:12,18 22:3
23:20 25:20 26:6,8
27:23 28:3,5 29:21
29:21 30:8 32:15,15
35:3 36:16,18 37:22
38:12,18 39:1,15
44:2,2 45:8,22
48:17 49:14 52:24
56:9 57:8,25 60:18
61:6 65:3 66:5 71:7
77:14 79:14 80:2
81:9,19 85:2 87:21
88:3,16 89:24 92:1
93:8
**mean**
7:17 10:20 16:14,19
17:20 18:7,20 20:6
22:6,8,8,9 24:9
26:12 27:18 30:4
31:11 32:3 33:11,12
33:20 36:25 37:9
41:22 43:23 51:4
52:19,23 58:4 59:4
59:20,21 61:15
62:22 70:14 77:3
81:22 82:11 87:24
89:6,14
**means**
16:18 18:7 30:1 58:5
94:13
**mediation**
87:15,21 88:3 89:21
89:22
**meeting**
32:13,18,23 33:18



34:10,18,20 41:8,12
41:15,16 89:15
**meetings**
8:13
**mention**
41:2
**mentioned**
18:5 22:19
**message**
43:7
**messages**
28:5
**method**
72:11
**Michelle**
12:10,20
**Microsoft**
17:5 18:14 70:11
**middle**
5:15 10:10 83:17
**might**
15:15 50:18 59:20,20
73:24 85:2
**million**
18:10,13 19:10,13
21:17,18,20,20,22
23:18,20,20 24:3,3
24:14,18,18,20
54:17 78:9 80:15
**mind**
28:1 56:23
**minute**
7:20 8:11 34:19
44:20
**minutes**
47:4 66:14,16 86:19
89:9
**misleading**
54:21 65:20 67:19,20
67:23 75:4,14 76:1
76:13 77:6 83:13
84:10,15 85:20 86:4
**mixed**
63:5
**moderate**
25:19

**moderately**
25:14
**moment**
28:22 31:5 49:14
57:21 66:24
**Monday**
87:9,15,21 88:3
89:20,22
**money**
15:24 17:1,2,13
18:24 19:23 20:2,5
21:4,12,12,14 24:6
35:17,21 60:12,13
60:15 62:4,7,12,18
62:20,22,25 63:1,2
63:4,6,6,16 76:18
76:21,23 77:2,3,10
77:15,16,18,24 78:5
78:8,12,14,16,18,23
79:2,4,5,12,12,16
79:17 80:5,6,9,13
80:25 81:1,6,10,13
81:16 82:1,5,14
**month**
9:23 21:4,5
**months**
30:24
**month's**
30:23
**more**
6:15 9:5 10:4,21 23:6
23:22 24:14 44:10
52:2 57:3,4 61:17
65:14,17 68:20,25
70:16 82:15 89:19
**morning**
4:15 5:9 89:20
**Morningstar**
37:6,7,10
**mortgages**
24:13
**most**
21:2 54:15 58:3 85:9
**motion**
35:1
**move**

26:17 82:10
**moving**
82:8
**Mr**
4:15,22 5:8,9,18,24
6:5,22,24 9:14
11:10,22 14:24 15:3
15:6,15 20:15,17
30:13,14 34:21
37:17 38:1,10,21
39:11 40:8,18 45:4
46:16,18,19,23 47:1
47:8,9 50:1 52:11
52:21 53:8 55:22
56:5,16,25 57:2,5,8
57:10,14,18,18 58:1
59:12 66:10,15,21
66:21 67:3,10,12
71:23 72:20 79:22
80:13 81:5,6,18,20
82:15,24,24 83:2,3
86:7,15,21,25 87:4
87:4,14,18,22 88:4
88:15,17 89:3,6,10
89:25 90:4,19,24
91:9,17 92:3,4,7
96:7
**MS**
4:13 9:11 46:14,17
49:22 52:8,15,25
55:16 56:23 57:1,4
57:6,9 59:3 72:19
88:11 89:5,14,23
90:13 91:13,21,25
92:9
**much**
23:16 26:17,19 34:24
41:25 57:5 63:2
65:17 87:10 91:20
91:23
**Must**
64:12
**muted**
9:13
**mutual**
33:22 35:4,6,7,20

36:2,20
**my**
4:18,18 10:20,22
11:9 17:7 18:19
19:2 22:15,15 25:21
25:23 27:4,9 29:21
29:22 30:20 31:17
32:22 34:15,16
38:17,17,17 44:15
44:15 52:3,23 53:7
53:23 54:13 58:12
64:10,14,16,17,21
65:15,24 69:5 72:4
73:12 74:15 79:3,10
79:10,15 83:24
86:13 88:7,11 89:6
90:4,13 94:8 96:21
**myself**
32:3 89:2

---

**N**

**N**
3:1,22
**name**
5:10 12:13,20 13:2
38:6 42:17 48:22
53:21,23 59:18
96:15
**names**
12:8 59:17
**nature**
26:25
**need**
6:5 7:4 9:5 10:4,21
20:18 27:20 30:3
57:2 82:25 90:19
**needed**
10:2 74:5
**needing**
88:24
**negative**
22:24 50:13,13,14
**never**
63:24 64:6,10,10,11
64:15,22 65:8 66:1
66:3 67:21,22 68:7



**news**
88:3
**next**
41:2 54:14,23 60:5
63:18 74:7,16 75:6
75:16 76:3,15,15
83:4,15 85:7,22
89:9
**nickname**
5:12
**night**
13:23 51:7
**nightmare**
87:13
**Ninth**
38:20
**no**
1:2 3:9 4:2 6:19 8:12
13:23,24 14:12 15:5
15:9,17 19:23 20:4
20:6,19 25:12 27:6
27:18 31:1 32:3
34:1 35:14,14,24,24
36:12,14,15 41:11
42:10 43:23,23
44:24 51:15,17,18
52:19,25 54:19 55:8
57:6 59:4,15 61:25
62:9,14 67:22 68:25
71:24 74:11,15,24
75:5,15,24 76:2,11
76:14 77:4 81:7,22
82:3 83:1,14 84:2
86:2 87:16,16,20,20
87:20,21 88:7 89:14
89:16,16,21 91:15
92:6
**none**
59:9 72:25
**non-responsive**
29:24
**nor**
94:10,11
**normally**
26:6 53:19
**Notary**

93:7,15
**note**
40:25 95:5
**notes**
54:14 94:8
**nothing**
4:25 18:2 58:6 90:16
91:24
**notice**
11:19 47:13,15,16,20
**noticed**
9:22
**November**
13:4 15:7 28:14
30:17 31:12 34:25
93:16
**now**
4:1 6:18 7:2 8:14
21:20 22:3,5 24:13
27:14 28:7,24 29:2
29:12 30:16 31:5
39:24 41:20 42:19
46:1 53:18 56:9,21
62:1 69:1 87:23
**number**
45:14 61:6
**numbers**
37:6

---

**O**

**O**
3:22
**OATH**
3:4 93:1
**object**
9:11 46:14 49:22
52:8,17 55:16 59:3
72:19
**objecting**
53:1
**objection**
46:16
**obviously**
23:15 33:13 35:1
41:5 44:22 54:10
61:2 65:14,16 85:14

87:10
**occur**
32:24
**occurred**
34:10 35:3 41:9,15
**odd**
51:24
**off**
6:22 15:2 37:5 47:5
48:22 57:12,15 66:9
66:15,16,18 83:22
86:13,24 87:1,5
88:14 89:23 90:1
92:11
**offer**
13:12 15:19,21 16:1
23:24
**offers**
23:25
**office**
96:11
**Oh**
14:12 36:20 42:13
57:5 90:24
**old**
7:5
**once**
30:11 90:20,20
**one**
6:18 9:25 10:16,22
16:2 20:13 21:14
23:8,8,9 29:5 30:12
32:20,20 38:15 46:5
50:15 51:10 54:23
55:12 57:21 60:24
61:7,16,17 62:2
65:22,22 66:24 72:9
81:13 83:20 86:17
87:21 90:21
**onerous**
10:18
**only**
20:13 25:5 27:14
51:1,20 72:10 82:2
**opinion**
51:19 52:3 53:7

54:13 58:12 64:18
65:24 79:15
**option**
16:11,18 56:4 59:6
67:25 70:21
**options**
16:13,17,19,20 17:8
54:24,25 55:12,13
55:18,19,24 56:2,3
56:4,11,12,13 58:17
75:20
**or**
4:23 6:11 9:6 11:3
14:16,16,24 15:15
15:25 16:10,12,21
17:5,11,11,16 18:10
19:22 21:18,21
22:12,24 23:19
24:14 25:1,2,17
26:10 27:7 29:1,5
29:15,16 30:22
33:15 37:1 38:9,16
38:25 39:22 40:10
43:1,12 45:3,8,25
46:5,10,13 50:15,16
50:21 51:6 53:4
54:21 56:8 58:6,8
58:18 59:21 60:24
61:2,16,22 62:2,17
65:20 67:18 68:7,20
69:17 70:20,22 75:4
75:14,18,19 76:1,13
76:15 77:6 78:12
79:17 81:6 82:3
83:12 84:9,15 85:19
86:4 90:12,12 91:3
91:9 94:10,10,11
95:5,8
**Orange**
38:20
**order**
18:25 25:1,3 90:18
91:8,12
**ordering**
96:14
**original**



95:5,6 96:13
**Orlando**
 2:3
**other**
 7:7,14 10:24 12:8
   14:2 15:3,25 27:2
   28:4,8 29:14 32:7
   32:12,21 41:19
   42:20 46:3,5 50:15
   59:10 60:24 62:2
   65:11 70:16,20
   75:18 81:6,13 82:8
   85:15 86:11 89:1
**otherwise**
 54:7,12
**our**
 13:16 28:6,9 35:17
   37:2,11 44:8,8
   49:12 58:11 63:11
   64:24 67:21 68:4
   78:9,18 84:6 88:18
   88:21 96:11
**ours**
 61:19
**ourselves**
 88:9
**out**
 5:15 10:10 17:2,13
   21:25 23:13 26:18
   29:13 30:6,19 32:17
   41:6,23 48:6 49:5
   53:15,16 59:25
   60:15 62:23 63:2,7
   63:9 66:2 76:16
   77:8,21 79:23 86:23
**outside**
 14:9 17:12 71:20
**over**
 7:15 9:22 14:20 23:2
   26:9 59:17,17 66:8
   70:22 92:2
**overall**
 53:13,17 54:11 70:15
**overlaid**
 17:4
**overlay**

18:5,12,16,20 63:20
   65:4,11 67:16 69:17
   70:9,16,19 71:4,8
   71:12,14 72:3,6,8
   72:11,15,17,24 73:7
   73:11,15,19,23
**overlays**
 16:12 18:8 71:5
**oversight**
 50:21
**owe**
 83:20
**own**
 18:13 81:8 84:19

---

**P**

**P**
 3:22
**PA**
 38:10 40:7 49:19
   50:16 52:5 96:19
**page**
 3:2,9 69:15,23 70:2,3
   70:18 95:6,8
**pages**
 94:8
**paid**
 19:11
**Palm**
 12:12
**Park**
 54:17
**part**
 10:23 25:22 33:25
   56:11 62:18 67:14
   67:18 72:4,4 73:7,8
   73:19 74:10,12,19
   75:1,3,10,13,22,25
   76:9,12,15,19 77:5
   77:12 84:14 88:21
**participate**
 63:3
**participating**
 4:17
**particular**
 8:8 9:18 12:2 27:3

28:1 37:8 41:19
   52:13 54:22 58:7
   64:5 84:19,23,23,24
**parties**
 3:23 4:11 94:10,10
**partnership**
 33:23,24
**parts**
 53:15 56:18
**patch**
 22:10
**pay**
 19:15,17,19 20:3
   21:4,5
**paying**
 25:7
**payment**
 24:7,19
**payments**
 20:23 70:22
**penalties**
 95:22
**pending**
 66:22
**Penn**
 96:18
**people**
 12:5,21 29:23 30:10
   30:10 32:9 61:6
   63:5,5,6 71:20
   79:12 82:15
**percent**
 17:22,22 19:11,13
   20:6 21:17,19,21,22
   24:13 37:3,4,4 62:6
   74:17 78:2
**percent's**
 17:23
**perform**
 37:2
**performance**
 36:18 37:12 80:22,23
**perhaps**
 13:12 22:4
**periodic**
 20:3

**perjury**
 95:22
**pers**
 26:2
**person**
 38:5 45:1 48:12
   61:16,17 62:10
   73:25 74:1
**personal**
 6:11 50:12 51:6 52:1
**personally**
 11:15 81:22 93:7
**person's**
 12:13
**pertinent**
 10:19
**Philadelphia**
 96:19
**phone**
 22:5 80:11 89:20
**phonetic**
 63:1
**phrase**
 71:8
**physically**
 30:9
**Pine**
 2:3
**place**
 1:19 26:10
**plaintiff**
 1:4,12 2:5 4:14 5:21
   5:22 90:5 91:3
**planning**
 15:20
**please**
 4:21,22 5:9 7:25 26:9
   30:11 86:25 95:1,5
   95:6 96:10,11
**pledged**
 67:24 75:19
**pledges**
 63:21 67:16
**PLLC**
 2:2 4:13 96:3
**plus**



MAGNA
LEGAL SERVICES

74:18
**point**
10:9 24:15 41:1 60:4
70:13 90:7
**POLK**
93:5 94:4
**portfolio**
17:21 23:5,14,24
24:1,1 58:24
**portion**
57:22 66:25 67:1,8
**position**
17:1,4 18:11,13,16
18:22,25 19:4 62:21
70:10 71:6 72:8,14
73:25
**positions**
16:12,12,25 17:2,15
17:16 18:12 23:7
62:23 75:8
**positive**
22:24 37:14 51:8
53:6,7,9 54:2
**possible**
11:18 26:19 87:8
**possibly**
11:6
**postpone**
11:7
**postponed**
87:20
**potential**
19:3 27:7 48:14
**potentially**
21:8 90:14 92:13
**practices**
42:12
**preexisting**
87:23 88:6 89:3
**preference**
89:6
**premium**
70:21
**prepare**
9:5 10:5,22 13:14,22
14:2,11

**prepared**
11:3,5,17 91:5
**preparing**
15:4
**present**
2:12 3:23 4:11 14:7
**presently**
47:19 88:25
**pretty**
8:24 34:24 73:4
**previous**
57:19
**previously**
45:16
**primarily**
13:10 24:10
**print**
96:10
**printed**
32:14,18
**prior**
7:1 33:17 34:20
65:11 90:20 91:9
**privilege**
9:13
**probably**
10:4 15:1 32:8 41:12
48:22 59:10 84:5,12
**problem**
26:12 28:18 71:24
81:17
**proceeds**
74:7
**process**
33:9,10,14,15 47:11
**produced**
88:20 93:18,19
**production@magn...**
96:12
**profitable**
25:2,3
**program**
3:13 16:3,6,8,16
17:14 18:4 25:10,10
25:13,19 36:11
49:20 50:17 51:14

54:25 55:1,13,14,23
56:4 58:7,11,17,20
58:21,23,23 59:2,13
59:14,23 60:1,1,2
60:13 62:5,13,16,19
62:23 63:19 64:10
64:14,16,22,24 65:4
65:10,15,23 67:15
67:21 68:11,24
69:13,17 70:4,15
71:3,10,13,15 72:2
72:6,13,17,24 73:7
73:14,14,18,19,21
73:22 74:21 78:12
79:17
**pronounce**
14:5
**pronouncement**
85:10
**proprietary**
54:25 55:4,6,11 58:4
58:5,17 59:10 60:8
60:13 65:18 67:23
**proverbial**
76:6
**provide**
47:13
**public**
42:15 44:13 54:1
59:7,25 93:7,15
**publication**
43:5
**publications**
28:1 52:14
**published**
63:25 65:9,12 78:11
80:7,19 81:2,14
**publishing**
64:13
**pull**
26:10 37:5
**pulled**
10:1 26:9
**purchase**
74:8
**purpose**

73:12
**purposes**
96:9
**Pursuant**
76:3
**put**
17:3 22:15 29:13
30:6 37:10 89:11,11
**puts**
17:9
**P.A**
1:6 4:4
**p.m**
1:18

---

**Q**

**quarter**
8:22
**question**
6:6 7:25 20:18 26:15
27:13,24 30:20
36:22 38:17 42:8
44:15 57:19,25 62:8
62:10 66:22 67:4,5
67:12 69:4 71:25
72:4 73:12,16 74:25
79:10 83:24
**questions**
9:4,12 10:4,7,18 11:2
11:5,14 14:17 49:14
49:15 52:9,17 67:7
**quickly**
8:24
**quite**
55:19,20 64:3
**quote**
18:21 29:23 64:2,3
64:16,19,21 75:17
76:6,7,7
**quoted**
68:4 85:12
**quote/unquote**
80:4

---

**R**

**raise**



4:22
**rate**
16:9,10 17:18 24:12
**rather**
18:1
**Re**
96:6
**reached**
60:15
**read**
1:11 3:3,7 4:3,22 5:5
5:9,11,18,24 6:5
11:10,22 32:3,3
46:19 47:9 49:14,16
53:19 54:4 56:5
57:19,22 63:11 67:1
67:8,13 69:7 77:7
77:20,21 79:22,24
79:25 80:1,10,24
82:6,7 83:16,25
86:7,21 87:4 89:3
93:7 94:7 95:1,5,22
96:2,6,7,13,23
**reading**
3:24 73:25 74:1 96:9
**reads**
66:25 72:4 79:13
**ready**
8:18 10:2
**Read's**
6:22 89:10
**reaffirm**
85:9
**real**
56:19 66:6
**reality**
78:8,21 79:5 80:25
81:12
**realize**
79:2 80:6,9 81:1
87:14
**realized**
10:17 80:17 82:1,1
**realizing**
81:15
**really**

8:17 13:9 14:12 20:4
63:3 70:5 72:25
73:1,2,3 74:3 78:6
82:4 85:4
**realm**
13:7
**reason**
8:8,15 13:10 38:11
38:18 63:17 88:22
95:8
**reasonable**
96:13
**reasons**
54:4
**recall**
7:20 8:25 9:2 32:5
34:23 36:21 41:20
81:18,20
**receipt**
96:10
**recent**
54:15 85:10
**reception**
86:18
**recollection**
28:25 29:3 34:21
48:10 49:8 61:21
**record**
4:1 5:10 30:2 47:5,7
57:13,15,17 66:16
66:18,20,25 67:12
86:24 87:1,3,6
88:14 89:24 90:1,3
90:15,23 91:7 92:11
94:8
**Reed**
6:19
**refer**
36:16 49:6
**referenced**
96:8
**referring**
80:21
**reflect**
90:16 91:7
**reframe**

27:23
**refreshed**
44:8
**regarding**
85:10
**Regardless**
51:9
**register**
76:7
**registered**
11:24 12:2 52:5
**regular**
58:24
**related**
36:7
**relating**
15:11 71:15
**relationship**
34:4,5 47:11,14,21
48:3,8,14 85:24
**relationships**
39:13
**relative**
94:9,10
**relatively**
16:11,17,23
**remainder**
90:8
**remained**
45:3
**remains**
75:9
**remember**
29:17 66:23
**REMOTE**
1:11
**remotely**
94:6
**remove**
55:11
**removed**
33:16,16 43:5 44:7
46:6,13,23
**repeat**
6:5 8:1 10:11 20:18
**report**

94:6
**Reported**
1:22
**reporter**
1:22 3:5 4:10,20,22
5:2 20:12,13 30:8,9
57:12,18,21,23 66:5
66:21,24 67:2,6,9
86:21 90:10,10,15
90:22 91:7,11,15,19
91:23 92:4 94:1,6
94:14,21
**represent**
4:12 26:21 38:8
79:11
**representations**
76:16 77:8,22 82:13
**representative**
1:12 7:14 11:12 91:3
**representing**
6:12,13,18
**represents**
75:17 76:5 77:14
**reproduction**
94:13
**request**
4:7 10:19 14:18
**requested**
9:10 57:22 67:1,8
94:7
**requesting**
90:11
**requests**
9:3 10:3 88:21
**required**
47:13
**requirement**
47:20
**researched**
78:25
**RESERVED**
3:24
**resolved**
57:13
**respectfully**
52:11


MAGNA
LEGAL SERVICES

**respective**
3:23
**response**
36:13,24 51:15 88:21
**responses**
7:8
**responsible**
68:18
**responsive**
89:1
**rest**
32:19 89:17
**restart**
66:17
**result**
60:8 62:5,13
**retained**
42:8
**return**
18:1 25:4 36:19 52:1
   96:11,15
**returned**
43:14 72:1
**Returning**
45:16 49:1
**returns**
22:23 23:11
**revenue**
36:8
**review**
94:7
**reviewed**
13:16
**RIA**
52:6
**ridiculous**
50:4
**right**
4:23 5:14 7:2,13,23
   8:7,14 10:14 12:19
   12:25 19:5,6 21:10
   21:12,18 22:5 23:21
   24:12,21,23 26:5,11
   27:1,14 28:11,24
   29:2,12 30:16 31:5
   34:9 37:16 39:3,20

41:10,12,18,20
42:19 43:6 45:5
46:1 47:4 48:9,25
49:1,17,24 53:18
54:8 60:5 62:1
69:16 70:7 86:16
87:14,23 88:4 90:4
90:17 92:7
**ring**
76:6
**risk**
25:18 59:8 75:9,19
   75:21
**risky**
25:14
**road**
13:9 20:24
**Rob**
32:20
**role**
36:10
**room**
7:6
**rough**
34:15
**roughly**
15:25 70:14 74:3
**Roun**
13:2 14:25 15:3,6
   32:7,12 38:1 45:4
**rule**
7:24
**rules**
7:21
**run**
10:13 23:10
**running**
10:5 22:4
**runs**
89:10
**Rutten**
15:15
**Rutton**
12:10
**R-E-A-D**
5:13,17

---
**S**
---

**S**
3:22,22
**safe**
26:10
**said**
9:2 10:4 11:4 14:19
   14:22 16:13,16
   17:25 18:8 23:13
   25:16 27:21 28:4
   33:8 35:2,3 41:13
   42:6 45:20 46:7,9
   47:24 50:8 51:3,17
   51:22 52:25 55:12
   64:10 77:19,20 78:7
   82:22 85:15 89:18
**sale**
75:20
**same**
6:18 21:16 36:22,23
   40:18 53:10 54:4
   70:6,7,14 71:12
   73:14 74:3 77:4
   94:13
**Sander**
1:11 3:3 4:3 5:5 93:7
   94:7 95:1 96:2,6,23
**Sander's**
5:11
**saw**
29:1 34:24 41:5
   43:25 46:8
**say**
12:5 15:7 16:22 17:4
   17:7,19,21 18:9,13
   19:10 21:16 24:16
   25:9,13 26:1 29:20
   30:21 31:6 32:10
   33:10 35:11,22 46:7
   51:5,22 53:4,24
   58:16 62:20 74:23
   76:23 77:2,18 80:18
   87:6 91:9,25
**saying**
10:12 30:11 51:4

68:6 73:2,17
**says**
30:16 39:5 40:14,15
   40:19 45:18 52:4
   54:15,23 60:5 64:20
   70:4,19,19 72:1
   74:7,16 75:6,16
   76:3,16 77:15 79:15
   79:16 83:4,17,19
   85:1,7,9,17,22
**Schmidt**
32:21
**screen**
26:14
**searched**
42:4 44:12
**SEC**
11:24 12:2 50:21
   52:5 83:17
**second**
9:4 10:23 13:17 22:1
   29:6,24 30:15 39:16
   43:18 47:10 66:9
   70:18 86:12,16,17
   86:17 90:21
**secret**
58:5,7
**secure**
9:8
**securities**
74:8,19
**security**
18:21 19:25 20:11,21
   23:3,17 24:17 25:2
**see**
6:25 7:3,7 27:8,20,22
   28:6,14 37:11 39:4
   39:11 40:13 42:19
   43:4 45:25 50:22
   57:8 68:20 69:18
   70:24 76:7 83:5
   85:17
**seeing**
20:13
**seek**
70:21



MAGNA
LEGAL SERVICES

**seems**
 24:5 56:16
**seen**
 7:1 27:18 68:12
**sell**
 18:14,15
**send**
 37:9 48:18 80:14
   92:1
**sense**
 24:6 52:2
**sent**
 33:14 34:11 37:17
   54:1
**sentence**
 49:17,18 52:4 53:12
   53:12 54:3,11,11,15
   54:22,23 55:10,11
   55:15,20 58:8,12
   60:5,14 63:18 64:7
   67:14,18 68:1,5,8
   70:18 71:1 72:1,5
   74:7,16,19 75:1,6
   75:16,22,25 76:3,9
   76:12,15,16 77:12
   77:21,24 78:2,20,23
   79:11,13,22,24 80:8
   80:16 81:15 82:15
   82:20 83:4,15,25
   84:1,4,7,11,14,18
   84:18,19,20,20,24
   85:7,11,14,19,22
**sentences**
 10:12
**separate**
 81:8 89:4
**sequence**
 59:7
**services**
 1:23 4:9,11 15:18
   96:18
**settle**
 40:8
**settled**
 39:20
**settlement**

3:12 40:5,21,24
   41:10,11,17 43:1,21
   43:23 44:5,16 45:9
   46:4 49:4
**seven**
 15:25 56:8 96:18
**several**
 42:1
**Shallbetter**
 1:22 4:10 93:7,14
   94:6,20
**sheet**
 3:6 37:10 95:4,7
   96:10,11,11
**she's**
 14:4,4
**shit**
 56:7
**shitty**
 22:7
**short**
 17:11 47:6 57:16
   66:19 87:2 90:2
**shortly**
 41:6
**should**
 14:19 82:6 91:1,4
**shouldn't**
 7:10
**show**
 26:7,8 38:25 39:22
   77:14 81:5
**showing**
 26:14 29:12 30:16
**shows**
 55:7
**Shruti**
 2:2 4:13 14:5 88:10
   96:2
**Shurecock**
 53:25
**sign**
 3:7 45:20 95:6 96:13
   96:15
**signatory**
 38:5

**signature**
 40:13,15 45:18 95:24
   96:15,21
**signed**
 38:5 43:21,23 44:20
   46:1,3 93:12
**significant**
 56:18
**signing**
 3:24 44:16 96:9
**similar**
 28:12 42:24 70:14
   71:16 72:15 73:24
**simply**
 9:17
**since**
 7:16 12:4 33:24,25
   49:2 50:11 72:25
**single**
 23:10 70:10 71:5
   72:8 73:25 77:13
**single-stock**
 16:12
**sir**
 47:23 57:13,21 66:24
   83:1 90:23 91:11,19
   92:6
**sit**
 27:14 28:24 29:2
   41:20 42:19 62:1
**site**
 43:6
**sitting**
 44:19
**situation**
 10:20 13:19 19:23
   20:2 36:7 44:11
**six**
 12:24 15:25 35:23
   56:8 61:22
**size**
 26:12
**skadam@waugh.le...**
 2:4 96:3
**skill**
 80:24

**slang**
 64:21
**slight**
 70:12
**slightly**
 71:13 74:2
**Smith**
 2:7 4:8,16
**sold**
 17:1,12,12
**some**
 8:11 9:4 10:11 13:18
   14:16,17,17,17
   15:11 17:16 18:21
   26:17 50:21 51:23
   54:14,21 58:3 60:12
   62:15 63:5,6 70:16
   76:21,23 77:2,4
   78:2 85:3,15 87:23
**somebody**
 43:11
**somehow**
 42:23 64:21 79:19
   84:6
**someone**
 25:10,14 32:12 42:10
   42:11,12 43:12 59:1
   61:2,20 82:4
**something**
 9:6 16:13 22:11 35:2
   35:3 36:16 37:7
   45:21 50:20 51:10
   53:9 65:10 68:6,23
   83:17
**sometime**
 20:24
**soon**
 34:24 91:21
**sorry**
 6:21 9:13 12:14
   16:15 22:3 27:20
   36:13 45:15 53:22
   62:8 71:22 76:25
   90:21
**sort**
 7:4 8:11 13:7,17



MAGNA
LEGAL SERVICES

23:12,12 24:11 50:21 51:23

**sound**
82:21

**sounded**
67:3

**sounding**
53:7,10

**sounds**
21:7,8 50:18 80:3 89:7

**Southeast**
2:8

**SOUTHERN**
1:1

**speak**
7:21 8:5 13:21 14:1 14:10,24 22:20 30:11

**speaking**
68:9 86:22

**specific**
64:25

**specifically**
44:12

**spell**
5:10 12:13

**spelling**
5:15

**spent**
37:1

**spin**
79:19

**spoke**
13:23 14:6,12,14 15:3 67:22 71:20

**spoken**
15:7,15

**spot**
49:2 82:8,9 86:10,11

**spreads**
17:3,3

**spring**
29:9 31:10,11

**Stand**
57:21

**standalone**
84:4,13 85:21

**standard**
85:23

**standards**
85:10

**Standby**
67:6

**stands**
28:7 86:5

**star**
37:1

**start**
20:23,24,24 21:1 82:8 87:5

**started**
34:23 78:25

**starts**
65:23 79:22

**state**
3:11 4:12 5:10 7:24 38:8,13,14,15 39:18 39:19 40:8 44:4 49:3 51:10,12 90:25 93:4,7,15 94:3

**stated**
37:16 95:22

**statement**
27:4 29:21 49:9,21 50:7 52:7 54:18,20 55:1 58:14 60:9 63:23 64:5,12 65:20 65:21 69:7 73:13 74:10,12 75:3,10,13 76:19,22 77:6 79:18 80:14 81:7 82:7,12 83:7,9 86:1,3

**statements**
3:13 52:13 58:8 68:12 69:3 79:1 80:10,18,20,23 81:4 81:9 82:6

**states**
1:1 63:18

**static**
10:11

**stay**
87:9

**step**
61:7

**steps**
43:4 44:6

**still**
27:10 41:6,23 42:2 42:14 43:8,17,19,20 44:13,17 52:18,25 90:22

**stipulated**
3:23

**stock**
16:21 17:4,17 18:10 18:15 19:12,13 21:17,19 24:3 40:3 70:10 71:5 72:8,14 73:25 75:19

**stocks**
16:10 63:21 67:17

**stop**
62:21 63:14

**Strasser**
48:25

**strategies**
15:22,25 16:2,24 59:6 71:17 72:15 75:18

**strategy**
17:6 59:1,5 60:8 63:20 65:11 66:1 67:16 72:3,6,11,18 72:24 73:7,10 75:21 76:5

**Street**
2:3,8 18:17 24:2 96:19

**strike**
17:1 25:2 29:1 43:11 56:19 60:18 61:6

**strongly**
37:14

**struggling**
23:1

**stuff**

**style**
79:15

**sub**
33:22 35:11

**subject**
10:16 61:22

**subset**
54:23 55:12 72:23

**substantial**
76:18 77:10,23 78:18 82:14

**substantially**
72:16

**sue**
54:8 82:4

**sued**
34:21 39:11 54:12 81:18,20

**suing**
25:22 26:2 52:12

**Suite**
2:3,8

**summarize**
65:15

**summarizing**
67:21

**sums**
76:18 77:10,23 82:14

**support**
35:21 39:7 80:12

**suppose**
7:19

**sure**
7:23 8:3 18:6 21:12 26:9 27:8 35:16 36:20 38:3 39:2 53:11

**surprised**
78:14

**surprisingly**
11:4

**suspend**
66:10

**suspended**
90:12

81:11



MAGNA
LEGAL SERVICES

**swear**
4:21,23
**sword**
21:11
**sworn**
5:6 93:8
**symbol**
36:2 37:11
**Szilagyi**
48:15

**T**

**T**
3:22,22
**table**
7:6
**Tactical**
35:25
**take**
10:16,16 16:9 18:8
21:8 39:16 43:4
44:7 47:4 53:12,15
79:7 89:15,17
**taken**
1:13 4:7 5:25 6:3
7:16 33:12 34:25
43:8,17 44:21,22
45:3,7
**taking**
11:19 63:2 64:25
87:11,11,12
**talk**
11:17 14:1 86:12
**talked**
66:1 78:3 84:21
**talking**
15:10 22:22 29:5,7
29:11 39:24 47:10
49:3,3,4 65:22 81:4
82:12
**tape**
82:25
**tapes**
47:3
**tax**
52:1

**technical**
44:11 87:11 88:1
**technically**
35:11 72:12,14
**technique**
44:10
**tell**
5:6 9:15,18 26:6
31:22 34:18,19
66:16
**tells**
37:6 52:24
**ten**
6:7
**term**
18:5,7
**terminate**
34:5 48:1
**terminated**
33:24 36:5,6 48:7
53:4 90:9 91:2,5
92:14
**terminating**
47:21 88:5 89:2,12
89:13 90:5
**terminology**
24:2
**terms**
36:18 61:11 73:10
**testified**
5:7 35:23
**testimony**
3:3 4:24 11:11 29:18
34:9 50:25 56:5
73:17
**text**
15:1 26:19 28:5
**than**
7:14 13:11 18:1 23:6
24:13 27:2 32:7,12
52:2 61:17 65:11
82:15 87:12 89:1,19
**thank**
5:2 7:13 30:12 35:7
57:1,9 74:5 90:15
91:15,20,23 92:2,8

92:9
**that'll**
28:9
**their**
4:12 35:18 38:6
47:11 48:16 63:11
63:15 70:23 81:8
**them**
33:23 34:2 35:13
48:2 49:13 59:11
60:15 61:2 63:12
76:21,23 77:2,3
78:22
**themselves**
81:8
**then**
7:16,24 9:3 17:12
18:22 20:7 27:10,23
32:19 41:1,12 43:24
43:25 44:3 51:4,18
51:19 55:7 61:18
62:15 66:11,16,17
69:15 70:2,3,7
73:12,19 74:8 77:15
82:2 83:19 84:25
85:9,9 88:1
**there**
5:16 7:12 8:14 12:18
20:1,1,19 22:24
27:2 28:4,8 30:6,19
33:18 36:13 41:6,23
41:23 42:1,4 43:7
44:19,24 49:5 51:16
59:7 60:20 61:24
66:2,12,13,21 70:12
70:12,15 79:8,9
82:17 83:16 84:25
88:20,25 89:8
**therefore**
56:14 58:19 68:2
79:17
**THEREUPON**
5:4
**there's**
10:17,17,18 19:23
20:6,10,21 24:9

28:7,13 35:23 59:5
59:10 63:5 65:14
67:22 69:4 70:2
79:8,8 85:9 89:21
90:16 91:24
**these**
9:12 12:19 14:16
52:9 68:22 87:10,10
**they**
4:12 20:24,24 21:1
24:10,11 32:14,15
32:21 33:3,3 34:2,2
35:10,14 47:12,12
48:3,3,7,7,10,16
51:10,11 60:17 61:2
61:10,13 63:6,7,7,8
63:9,10,14,14,17
75:7 77:15 79:2
**they're**
33:5 35:17 71:16
74:2,2
**they've**
82:5
**thing**
9:25 70:7 85:15
87:19
**things**
7:8 8:19 10:1 14:20
15:11 28:4,8 33:13
51:24 64:1,14
**think**
6:1 7:18 8:19 10:19
13:3 21:24 27:13
29:16 30:18 31:11
31:12 33:14 34:24
37:2,3 44:8,21
50:19,23 51:5,7,24
52:2 53:3,25 54:2
54:10 60:11 61:3,19
63:4 64:19 68:25
73:4 80:23 84:11
85:2 88:23,23 89:4
**Thompson**
48:24
**those**
12:21 16:2 17:14



28:22 49:13 52:17
58:7 74:16 81:4,5
89:4,22 91:21
**though**
7:21 9:22 31:12
**thought**
11:6 28:3 78:5 87:19
87:24
**three**
61:18 65:15 79:25
87:25
**through**
13:17,20 22:10 49:17
54:24 55:13,13
62:18 77:13 78:25
92:15 94:8
**ticker**
36:2 37:11
**till**
34:25
**time**
1:18 4:6 6:1 9:5,8,25
10:5,16,21 15:6
28:2,25 29:6,8,10
30:12,23,24 31:10
31:13,19 32:2,10
34:17 41:2 42:25
43:15 44:3,5,23,25
45:11 47:4 49:5
53:10 58:18 59:17
65:11 66:6,22 88:23
90:7 91:13 92:10
96:13
**timeline**
45:14
**times**
10:8 15:3 23:2,14,23
24:16 41:19 79:25
**timewise**
34:13
**title**
49:18 51:12,25 54:5
58:20 59:13 70:3
**titled**
54:25 55:14
**today**

4:5 8:10,16 9:22
11:11 13:15,21,24
14:3,11 90:6,8,13
91:2 92:8
**together**
37:24
**told**
9:19 10:20 32:1
45:13 68:7 79:4
80:24 87:21
**tolerance**
25:18 59:9
**Tom**
36:1
**too**
57:5
**took**
6:7 19:21 81:2
**top**
16:25 17:4,15 18:12
18:16,22 19:3 24:3
48:22
**topics**
11:18
**tortious**
39:12
**total**
36:18
**tough**
14:5
**trade**
16:18,20 17:9,16
21:15 25:1 55:18
56:12 58:6 59:11
**traded**
17:5
**trademarked**
59:14
**trades**
13:7 16:11,14,17,25
17:8,14 63:3,15
**trading**
16:24 17:23 54:24,25
55:13,13,24 58:18
59:7,9 62:21 63:10
63:15 71:17

**transcript**
90:18,19 91:8 94:7,8
94:12 95:5,6 96:8
**transcription**
95:6
**transit**
8:5 22:19 53:18
**tricky**
83:16
**tried**
26:16 43:13 61:10,10
**Triple**
61:10,11
**troll**
29:14,23
**trolling**
29:18 30:7
**true**
33:13 53:9 54:22
55:10,15,18 58:19
62:15 64:17 72:16
76:22 77:11 80:25
82:19 83:11 94:8
95:23
**truly**
96:17
**trust**
48:16
**truth**
4:24,25,25 5:6
**try**
30:6,11 57:4
**trying**
7:18 9:20 11:2 23:13
86:9,11 87:6
**turn**
86:8
**turned**
76:16 77:8,21 79:23
**turning**
67:13
**two**
17:2,11,12,12 23:8
30:10,23 58:8 61:19
67:7 83:21 89:4
**typing**

54:14
**T-A-S**
36:1

_____
U
_____

**U**
3:22
**Uh-huh**
33:2 34:8 43:3
**ultimately**
24:7 25:7 39:20
**under**
40:15 50:3 78:22
94:13 95:22
**underlined**
85:25
**underlying**
17:15 18:12,22,24
19:4 20:10 23:3,17
23:21 24:17 25:5
70:23 74:18 75:8,18
**underneath**
20:21 23:7 40:18
**understand**
7:25 8:4 11:10 16:18
18:6,23 19:7 26:1
30:1 52:15 60:20
69:3,7 91:2
**understanding**
3:13 13:5,25 17:7,24
18:19 19:2 25:21
27:15 36:15 38:4
61:5 68:11 88:11,17
90:5,14
**understood**
8:2 15:14 25:1 30:13
**undertaken**
44:16
**unfortunately**
34:3 42:15 53:18
82:5
**UNITED**
1:1
**unless**
94:13
**unlike**



75:17

**until**
57:13 66:10 69:23
81:1

**untrue**
72:6

**up**
8:23 10:1,9,14,17,24
12:15 21:19,22 25:7
26:10,16 33:25 37:2
37:3,4,4,5 45:3,23
46:9 56:5 60:19
61:6 63:6 65:25
66:4 68:5 69:23
80:15,15 83:19
89:10

**upholding**
84:6

**Upon**
96:10

**upper**
39:4

**upset**
60:11

**URL**
27:10,17 33:25 34:3
41:22 43:8,16,19

**us**
13:19 16:22 27:8
29:15 35:11 48:1
59:11 66:16 85:1
86:22 87:11 96:15

**use**
18:11,16 19:9 24:10
24:17 70:11 71:14
72:17,24 73:6,9,18

**used**
63:21 67:17 71:7
72:11 74:8

**uses**
16:16

**using**
18:23 19:20 25:4
58:24

**utilize**
23:25

---

**V**

**v**
4:4 95:2 96:6

**value**
18:24 19:25 20:10
21:9 23:2,16,21
25:5 75:9

**vehicle**
71:21

**verb**
64:25

**verbatim**
53:25

**verify**
44:7,17 45:2,7

**Vero**
8:13

**versus**
17:17 23:20

**very**
8:22 24:11 30:19
53:13 54:2 56:5
71:16 72:15 73:24
79:18 91:20,23
96:17

**via**
2:1,12 93:8 96:11,25

**video**
6:22,23 22:9,18 86:8
86:13

**videoconference**
1:11,19 2:1,12 93:8
94:7

**videographer**
2:13 4:1,8,20 6:21
47:2,5,7 57:15,17
66:18,20 82:24 83:1
86:7,14,23 87:1,3
90:1,3 92:6,11

**Videotape**
4:2

**view**
10:9 60:4 70:13

**viewed**
42:3

---

**virtually**
4:7 7:11

**vision**
59:8

**volatility**
8:23

**volume**
10:3,17

**vs**
1:5

---

**W**

**wait**
9:4 86:17

**waive**
96:14,21

**Wall**
18:17 24:2

**want**
9:20 10:7,7 13:8,25
18:6,14 26:7 28:22
34:14 36:25 49:14
58:9 63:10 79:18,18
82:3,20 84:18 88:13
89:5 90:24

**wanted**
13:6 16:17

**wants**
25:11,14

**war**
8:22

**wasn't**
8:10,15,17 9:21 43:8
43:17 44:1,19 55:17
56:3 89:18

**watching**
44:20

**Waugh**
2:2 4:13 96:3

**way**
7:5 21:13,16 26:18
42:9 43:9 46:5
49:23 50:15 51:25
54:21 57:5 60:24
62:2 73:1 83:13

**Wealth**

---

1:3,12 4:3,14 5:20
11:22 12:1,6,9,22
15:19,20,21 26:2
27:3 31:19 32:6
36:9,11 38:9,18
39:10 40:6 43:21
45:9,18 46:4,11,21
47:12 49:8,19 50:25
51:14,19 52:6 53:24
54:16 60:6,21 61:9
61:14,22 62:3,11,16
63:20 67:15 68:15
72:3 73:21 75:6,16
76:4,17 77:9,22
81:21 83:5,10 85:4

**website**
12:18 43:13 44:9,18
44:20 46:23

**week**
11:3

**weeks**
14:19 88:9

**well**
7:23 14:12,15 16:8
16:19 18:9 21:16
24:15 26:6 27:6,18
27:23 28:3,19 30:5
30:24 33:18 35:14
37:24 38:24 42:7
43:11 53:14 60:18
61:6 62:20 63:8
70:9 71:4 72:7
73:16 81:24 84:20
88:15 89:6,14 92:1

**went**
13:20 14:20 43:6,20
47:9

**were**
6:18 7:5 8:10,25 9:7
9:19 10:12 13:12
15:10 22:22 23:18
24:15 26:25 28:4,4
31:24 33:8,10,15
36:5,6 37:2,3 38:5,5
42:4 44:16,23 45:6
47:10,12 48:6,13



49:2,3,4 51:7 55:8 56:4 60:20 63:6,15 63:16 66:4 67:13 71:8 76:25 78:22 87:4,6,15 88:22 91:5 92:15

**weren't**
84:6

**we'd**
7:6 11:6 77:13

**we'll**
68:20 83:2 85:17

**we're**
5:14 7:10 18:11,15 18:15 29:11 34:1 35:16 38:24 39:24 41:5 49:2 50:3 51:25 53:4,20 56:14 82:12 90:22,25,25 91:22

**we've**
37:1 45:16 53:20 65:22 66:3

**whatever**
7:21 19:4 24:7 27:7 33:15 43:24 49:15 53:25 58:6,8 60:2 68:18 81:11 82:3 84:7

**whatsoever**
58:15

**what's**
13:6 23:5 33:5,8 46:16 53:21,21 61:5 69:5,5 71:25 73:16

**when**
6:2,2 8:25 10:16 15:10 17:19 18:7 20:22,23,25 21:7 25:4 26:1 27:11,24 28:16 29:3 31:23 32:10 33:10 34:4,4 34:17 35:22 41:2 45:23,23 46:8 49:23 50:11 62:20 66:16 76:23 77:2 78:10,16

78:25 79:4 80:15,18 81:25 82:1 92:1

**whenever**
34:25,25

**where**
20:2 22:7 26:7 51:7 64:2,23 67:13 69:19 73:21 77:18 79:10 79:22

**Whereas**
70:11

**Where's**
77:24

**whether**
9:17 18:10 34:23 38:15 44:17 45:2,7 46:5,12,22 47:19 50:15 60:17,24 61:1 62:2 73:6 78:4,11 81:5,18,20

**which**
10:19 18:23 23:6,24 24:13 28:12 33:16 36:7 42:7 50:4 54:16 55:9 63:21 67:16 68:1,6,10 72:3,9,11 75:18 79:6 80:23 81:2 88:21 96:13

**while**
10:5 26:10 86:11

**who**
12:9,21 25:10,14 37:20 38:5 42:20,20 45:1 48:12,13,13 60:7,18,21 62:3,10 62:16 70:21

**whole**
4:25 5:6 13:7 55:20 56:5,13 64:7 79:2 84:17 87:19

**whom**
4:12 5:18

**who's**
12:12 14:7 33:7 50:4

**why**

9:21 13:5 30:6 58:20 63:9 73:19 79:6 81:2 85:12

**will**
4:11,20,24 24:6 28:23 38:25 45:14 49:15,17 50:17 68:10 75:7 78:2 89:8 90:7,16 91:7 91:17,17,21

**wing**
78:22

**Winter**
54:16

**wish**
90:18 91:8,12 96:14

**with**
4:17 7:1 8:14 9:12,16 9:25 10:10 12:6 13:1,23 14:4,6,10 14:12,14,24 15:3,8 16:21 17:17 22:1,18 27:7 29:23 32:13,14 32:18 33:4,9,11,23 34:1,4,5 38:12,18 39:12 47:12,20 48:3 48:8,14 53:20 62:23 63:24 64:1,6,7,8,12 64:15,22,25 65:8,15 65:23,25 66:3 71:7 76:25 78:7 79:4,14 79:23 81:23 85:2,24 88:19 89:3 91:22,22 94:11 96:14

**within**
30:23 96:13

**without**
22:8 46:5 81:14

**witness**
4:21 5:1 6:23 20:14 20:16 30:5 46:15 49:23 52:19 53:3 55:17 57:24 59:4 66:6,8,13 71:20,22 86:9,16 87:7,16,19 87:24 88:7,16 89:11

89:16

**witness's**
21:24

**Wolper**
1:6,7 2:12 4:4,5,18 27:19 33:7 34:21 37:17 38:10,10,21 39:11 40:7,8,18 42:10,12,24 49:19 50:4,15 52:4 53:4,5 55:8 60:6,11,22 61:3,8 62:4,12,18 63:24 64:1,6,9,15 65:9,25 67:22 77:14 77:15 78:3,7,10,25 79:4 80:23 81:1,10 81:23 82:1,5 95:2 96:6

**Wolper's**
43:13 44:9 46:23 76:20 79:20 81:6

**wonder**
22:17,17

**word**
35:15 42:22 55:11 59:19 61:24 64:23 77:4,24 79:23 83:21 85:24

**words**
46:3 65:15 69:17

**working**
31:18 34:1 53:20 81:22

**worry**
30:3

**worth**
18:13 19:13 21:18

**would**
6:2 12:5,24 16:5,25 17:7 19:19,20 20:22 20:22 21:14 22:8 23:19 24:14,19 25:9 25:13 26:6 30:21,22 31:6 32:10 35:7,8 35:11 36:23 37:7 38:11 39:7,7 41:9



41:16 45:17 47:14
50:20,21 53:19 54:3
55:14 57:12 67:6,21
69:8 71:7 72:13
80:12 81:5 86:24
87:25 88:18
**wouldn't**
54:12
**write**
35:24 59:22
**writing**
30:10 47:17 48:10
**written**
78:15 79:3
**wrong**
65:3 80:16 81:16
82:8 86:10
**wrote**
80:16,17
**www.MagnaLS.com**
1:24

**X**

**X**
3:1 93:18

**Y**

**yeah**
5:11 6:1,7,8,10,15
8:9 10:13,13 11:13
12:16 13:13 14:4,13
14:23 17:5 20:19,20
21:1 22:6,8,15,21
23:23 24:23,23
29:10,13,15 31:10
32:20 35:10,12,17
36:5 37:9,25 39:2,6
40:4,14,20 41:22
42:14,23 45:20
47:15 48:24 50:12
51:11 53:3,21 56:10
56:25 57:25 61:24
65:2,6,24 68:20
71:4 76:24 77:1,7,7
77:11,25 82:11 84:7
84:23 87:7,24

**year**
31:7 32:7,11 34:6,7
36:17 86:20
**yearly**
56:3
**years**
6:7,15,16 7:15 36:23
**yep**
6:1,16 12:23 41:18
68:14 70:1,5,25
76:8
**yes**
5:1,23 6:19 11:16,21
12:25 13:3 14:8
15:13 16:1 22:4
25:8,25 28:15 31:8
31:21 32:13 38:3,23
39:9,14,21 40:9,14
40:14,17,23 47:18
47:22,24 48:7,11,20
50:9,24 56:2 57:14
60:4,10,14 61:15
64:1,4 68:8,17,21
69:11,14,21 71:17
76:20 82:16 83:6
86:15 90:19 91:11
91:19
**yesterday**
11:1 14:21,22 15:7
15:10
**yet**
28:9 90:17
**yield**
3:13 16:3,6,16 17:14
25:10,13 36:11
49:20 50:17 51:14
55:1,14,23 58:21,23
58:24 59:2,14,15,16
59:16,20,21,21,22
59:23,24 60:1,1,2
62:5,13,19 63:19
65:4,10,23 67:15
68:11,24 69:13,17
70:4,11 71:2,6,9,11
71:15 72:2,5,7,7,13
72:17,23 73:7,10,14

73:18,21 75:21 76:5
**yielding**
17:17
**your**
3:13 4:23 5:10,15,24
6:2,11 7:7,7,8,16
9:8,16,19 10:7,10
11:2 13:22 14:18
17:21 19:10,20 20:5
20:8,8 23:2,2,17,18
24:16,17,19 25:4
26:14,16,22 28:17
29:4 30:20,22,24
31:7,15,19,23 32:2
32:11,17 34:4,5,9
34:21 39:1,23 40:2
40:13,15 41:3,21
45:17 48:9,23 49:7
50:12 51:6 52:1,11
53:21 56:16 59:8
61:5,21 62:24,24
66:11 68:9,11,23
71:25 73:5,17 76:25
86:8 88:6 92:9 95:5
96:15,15
**yours**
35:9 96:17
**yourself**
12:6,24 37:5 79:21
80:1
**you'd**
44:13 80:14
**you'll**
23:7 37:11
**you're**
5:15 6:18 7:1 11:11
11:17 21:22 23:23
24:18 26:9,10 36:16
45:22 52:22 53:18
64:25 72:7,9,22
73:2,3 74:4 80:13
81:4,11 86:21,22
**you've**
18:21 21:4 84:22
**Yuval**
63:1 81:13

**Z**

**Zavanelli**
12:11
**Zoom**
5:12 16:21 22:4,9,13
22:14,14,16 31:2,4
31:13 32:15 36:25
37:1 48:1,5 49:10
54:7 55:25 56:2,4
56:12,13,14 57:24
62:21 65:6,7,24
66:3,7 86:19,20
**zooming**
56:23

**$**

**$1**
18:9,13 19:10,13
21:16,18 23:18 24:2
24:14,18
**$1.8**
78:9
**$5**
24:18,19
**$6.7**
24:3
**$650,000**
23:19

**0**

**0**
20:6
**0:25-cv-61608-MD**
1:2
**03-03**
39:5
**03-03-2025**
39:5

**1**

**1**
3:10 4:2 23:20 39:17
92:15 95:3
**1st**
1:17 4:5 9:2 93:8
**1.8**



80:15
**1:43**
90:3
**1:46**
1:18 92:11
**10**
21:17,19,21,22 37:4
70:3
**10:10**
1:18 4:6
**100**
62:6 78:2
**100,000**
21:18,19
**11:13**
47:5
**11:19**
47:7
**11:35**
57:15
**11:37**
57:17
**11:51**
66:18
**110**
2:8
**12**
74:17
**12:08**
66:20
**12:36**
87:1
**12:41**
87:3
**12:45**
90:1
**14**
74:17
**15**
6:15 7:15 40:3 89:9
**160**
54:17
**1635**
96:19
**18**
6:16

**180-1963**
85:2
**19**
40:11
**19th**
40:16 43:1,10,12,20
44:6 45:4,8,19
46:11,21
**19103**
96:19

_____
**2**
**2**
3:11 21:20 39:18
69:15
**20**
23:22,22 40:11
**20th**
40:22 41:1,21
**200,000**
21:21,23
**2008**
6:16
**2009**
12:4
**201**
2:3
**2020**
36:23
**2024**
28:14 30:17 31:7
32:7 36:17
**2025**
15:7 32:11 33:1
34:10 38:11,22 39:8
40:11,16,22 41:2,9
41:16,21 43:1,10,12
43:20 44:4,6 45:4,8
45:19 46:11,21
**2026**
1:17 4:5 93:8,12
94:17 95:3 96:1
**2029**
93:16
**21**
36:23

**21st**
28:14 30:17
**22**
36:23 37:3
**23**
36:23 37:4
**24**
29:9,10,15,16 30:18
31:12 37:4,15
**25**
29:10 31:11 32:25
36:23 37:3,14
**26**
93:16
**2600**
2:8

_____
**3**
**3**
3:12 17:22,23 38:25
40:25 45:17
**3rd**
38:11,21 39:8 44:4
45:3,8
**3-20-2025**
40:19
**30**
59:6
**315**
2:3
**32801**
2:3
**33301**
2:8
**375**
85:1
**39**
3:10,11

_____
**4**
**4**
3:13 17:22,23 68:10
92:15 94:8
**4.49**
24:13
**40**

3:12
**404**
43:7,14

_____
**5**
**5-8**
91:11

_____
**6**
**6**
37:4
**6th**
2:8
**6.5**
23:14,19,20
**6.71**
23:6 24:2
**60-day**
47:15
**68**
3:13

_____
**7**
**7**
23:14 37:4
**703864**
93:15

_____
**8**
**8**
69:23 96:1
**8th**
91:10 93:12 94:17
96:19
**80**
19:11,13
**866-624-6221**
1:23 96:20

_____
**9**
**9**
70:2
**92**
94:8
**93**
3:4



**94**
3:5
**95**
3:6
**96**
3:7

